UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

Chapter 11 (SubChapter V)

BUCKINGHAM TOWER CONDOMINIUM, INC.
f/k/a BUCKINGHAM OWNERS, INC.,

Case No. 22-22403-shl

Debtor.

-----------------------------------------------------------------X

## SMALL BUSINESS SUB-CHAPTER V PLAN

## ARTICLE I
## DEFINITIONS

Unless the context requires, the following capitalized terms shall have the following meanings ascribed to them in this Plan. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to it therein. Where the context requires, any definition applies to the plural as well as the singular number.

1.1 "**Administrative Claim**" means a claim for, or request for payment of, an Administrative Expense (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, and (ii) as to which any objection has been resolved by a Final Order to the extent such objection has been resolved in favor of the holder of such claim.

1.2 "**Administrative Expense**" means any cost or expense of administration of this case, other than Bankruptcy Fees, allowable under sections 503(b) or 330 of the Bankruptcy Code.

1.3 "**Allowed**" means a claim against or interest in the Debtor that has not been disallowed pursuant to a Final Order and is not a disputed claim and (i) with respect

to which a Proof of Claim has been timely filed with the Clerk of the Bankruptcy Court or, (ii) if no Proof of Claim has been filed, that has been or hereafter is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent.

1.4     **"Apartment"** means one of the individual apartments which comprise the Debtor.

1.5     "**Bankruptcy Court**" means the bankruptcy court presiding over the Debtor's Chapter 11 case.

1.6     "**Bar Date**" means any date set by Order of the Bankruptcy Court subsequent to which a Proof of Claim or Proof of Interest is not timely filed.

1.7     **"Building"** is the premises 615 Warburton Avenue, Yonkers, NY 10701.

1.8     "**Claim**" means a claim as defined in section 101 (5) of the Bankruptcy Code.

1.9     "**Class**" means a category of substantially similar Allowed Claims as established pursuant to Article 3 of the Plan.

1.10     "**Confirmation**" means the entry of the Confirmation Order.

1.11     "**Confirmation Date**" means the date on which the Confirmation Order is entered by the Bankruptcy Court and becomes a Final Order.

1.12     "**Confirmation Order**" means an Order confirming the Plan pursuant to Section 1129 of the Bankruptcy Code in form and substance reasonably satisfactory to the Debtor.

1.13     **"Condo Association"** means the Buckingham Tower Condominium Association which maintains the Building.

1.14     **"COVID"** means the COVID-19 global pandemic.

1.15     "**DCG**" means Dwight City Group.

1.16  "**Debtor**" means Buckingham Tower Condominium, Inc. f/k/a Buckingham Owners, Inc.

1.17  "**Disbursing Agent**" means any entity designated in the Confirmation Order to make distribution in accordance with the terms of the Plan.

1.18  "**Distribution**" means a disbursement made under the Plan.

1.19  "**Effective Date**" means the first business day after the Confirmation Date and the other conditions to the Effective Date set forth herein have occurred.

1.20  "**Estate**" means the estate created on the Petition Date pursuant to section 541 of the Bankruptcy Code.

1.21  "**Executory Contract**" means an executory contract within the meaning of section 365 of the Bankruptcy Code and includes leases to which the Debtor is a party.

1.22  "**Final Order**" means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal located in one of the states, territories or possessions of the United States or the District of Columbia, that has not been stayed or that is no longer subject to appeal, *certiorari* proceeding or other proceeding for review or rehearing, and as to which no appeal, *certiorari* proceeding, or other proceeding for review or rehearing shall then be pending.

1.23  "**Guerrero**" means Jose Guerrero, who chairs the Debtor's Board of Directors and is the principal of 615 Warburton.

1.24  "**Interest**" means an equity interest in the Debtor.

1.25  "**IRS**" means the Internal Revenue Service.

1.26  "**NYS**" means New York State Department of Taxation and Finance.

1.27  "**Petition Date**" means June 30, 2022, the date on which this case was

commenced by the filing of a voluntary petition for relief under Sub-Chapter V of Chapter 11 of the Bankruptcy Code by the Debtor.

1.28     **"Priority Claim"** means a claim entitled to Priority under section 507(a) of the Bankruptcy Code with the exception of Administrative Claims.

1.29     **Professional**" means all professionals employed by the Debtor under section 327 of the Bankruptcy Code pursuant to a Final Order.

1.30     **"Professional Fees"** means compensation for services rendered, and reimbursement of expenses incurred, by Professionals, as awarded by Final Order following application, in accordance with section 330 of the Bankruptcy Code.

1.31     **"Proof of Claim"** means a proof of Claim filed pursuant to section 501 of the Bankruptcy Code and Part III of the Bankruptcy Rules.

1.32     **"Property"** means the assets of the Debtor, as listed on Schedules A/B of the Petition, or otherwise noted in this Plan.

1.33     **"Pro Rata"** means the proportion an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in such Class.

1.34     **"Schedules"** mean the schedules of assets and liabilities and the filed by the Debtor with the Bankruptcy Court in accordance with section 521(1) of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules and any amendments thereto.

1.35     **"Shareholders"** mean collectively the individual shareholders of the Debtor.

1.36     **"Titan"** means Titan Capital ID, LLC.

1.37     **"Trustee"** or **"SubChapter V Trustee"** is and refers to the Sub-Chapter V Trustee, Heidi J. Sorvino.

1.38     **"Unsecured Claim"** means a Claim, that is not an Administrative Claim

or a Priority Claim.

1.39    "**Unexpired Lease**" means an unexpired lease within the meaning of Section 365 of the Bankruptcy Code.

1.40    "**Units**" mean the individual apartment units which comprise the Building.

1.41    "**Warburton Apartment**" means the Apartment numbered 5L in which the Shareholder, Guerrero, holds an interest.

1.42    "**Yonkers**" means the City of Yonkers.

1.43    "**615 Warburton**" means 615 Warburton Holding Group an entity owned and controlled by Guerrero.

## ARTICLE II
## BACKGROUND

On June 30, 2022, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor is a cooperative corporation which is in the process of converting to a condominium. It is in the business of owning and managing twenty-five (25) Apartments, twenty-four (24) of which of which are occupied by individual Shareholders and their families; one of which is occupied by the Building's superintendent. The Apartments are located in the Building. The Building is managed by the Condo Association to which the Debtor pays monthly maintenance charges. The Condo Association maintains the Building and provides for insurance coverage. There are 89 individual units in the Building – approximately 65 of which have been converted into condominiums and 24 of which remain cooperative apartments within the condominium. The 25 Apartments comprise the Debtor's assets.

The Debtor's financial predicament began in or about 2008. The sponsor

of the cooperative association obtained a mortgage and, despite collecting common charges from the Shareholders, neglected to make payments. The mortgage holder sought to foreclose. The Shareholders learned of this and ousted the sponsor from control.

Titan acquired the foreclosure judgment by assignment and extended additional financing to the Debtor. According to Titan, its role was initially to serve as a "bridge lender" to provide interim financing. This role was extended to essentially a "long term" lender through a series of forbearance agreements.

With Titan anxious to be paid off, the sponsor (who owned a block of apartments), along with the Debtor, reviewed various "exit" options. It was determined that conversion of the Building's Apartments from cooperative apartments (where the interest holder owns stock assigned to the apartment) to condominiums (where the interest holder owns title through a deed), would present the most efficient path to satisfy Titan. Since 2018, approximately 65 apartments have been converted from cooperative apartments to condominiums (in blocks of at least 10). Upon the conversion, Titan received payments in exchange for a release (i.e. there was a release price that Titan would accept for each unit and in exchange for that release price, the owner of the condominium would receive a deed to the apartment).

Titan has alleged that approximately $2,282,657.00 remains due and owing although it has not filed a proof of claim. Titan holds a note, mortgage, assignment of leases and rents and a foreclosure judgment lien.

Since the filing, the Debtor has continued in the management of its property as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

No official committee of unsecured creditors or other statutory committee and no examiner has been appointed in this case. Heidi J. Sorvino serves as the Sub-

Chapter V Trustee.

The Debtor's goal from the outset of this case has been to formulate a plan that satisfies Titan and other creditors but also (i) permits the Shareholders, many of whom are elderly, to continue to reside in the Building if they wish to and (ii) offers fair value to those who wish to leave.

Pre-petition, the Debtor was exploring funding a plan through: (i) the sale of some of the apartments in a block; (ii) common charges generated; (iii) refinancing, or a combination thereof. DCG, which owns other Units in the Building, had expressed an interest in acquiring the Apartments pre-petition. Post-Petition, DCG made an initial offer to purchase the Apartments. As discussed more fully below, the basic terms of DCG's offer were presented to Shareholders many of whom provided comments. The terms were thereafter negotiated and finalized. They were presented to the Shareholders with options for moving forward.

## Significant Aspects of the Bankruptcy

Following the Debtor's Chapter 11 filing, the Debtor and Titan reached an agreement for the use of Cash Collateral on an interim basis. The Debtor has complied with its obligations under the terms of such agreement. An Order approving the use of Cash Collateral was entered on August 19, 2022 (Dkt. No. 32). The Debtor moved for approval of an interim waiver of the requirement that it establish a DIP checking account. An Interim Order approving the use of its pre-petition bank account was entered on August 15, 2022 (Dkt. No. 31). A Second Interim Order was entered on September 22, 2022 (Dkt. No. 54).

The Debtor retained Penachio Malara, LLP as its counsel. An Order authorizing same was entered on September 12, 2022 (Dkt. No. 42). Applications to retain an account (Dkt. No. 24) and special counsel (Dkt. No. 40) are pending. The Debtor is

current with operating reports having filed through August 2022.

### **The Shareholders**

The Apartments consist of one Unit occupied by the Building's superintendent and 24 Units occupied by Shareholders. The Shareholders, many of whom have resided in the Building for decades, were provided with information about this proceeding and various options as to an exit plan. A list of Shareholders and their interests is annexed hereto as Exhibit A.

The Shareholders were invited to attend a Zoom meeting which was conducted on August 24, 2022. Approximately 18 Shareholders were in attendance. Several appeared with counsel. All Shareholders were afforded an opportunity to express their views and any questions posed were addressed by counsel and Guerrero. Many Shareholders expressed disappointment and frustration that Titan had not been satisfied. However, as Guerrero explained, it was difficult to raise common charges and impose assessments on Shareholders, many of whom are elderly and receive a "fixed income", particularly during COVID.

Following the ZOOM meeting, based on the overall sentiment of Shareholders, Guerrero and counsel contacted DCG to discuss a purchase of the Apartments. DCG and the Debtor engaged in extensive negotiations. Ultimately, DCG extended an offer to purchase the Apartments which provided each Shareholder with the choice of (i) selling but remining in the Apartment as a tenant with a lease and a re-purchase option or (ii) selling and vacating. The consideration offered by DCG exceeded its initial offer significantly.

Thereafter, on September 7, 2022, a letter was sent to the Shareholders which outlined DCG's proposal.

Three options were presented to Shareholders as follows:

OPTION NO. 1 ("PURCHASE OPTION"):   Purchase of the unit to which your shares are assigned by paying the "Acquisition Price" of $175 per square foot plus reasonable closing costs in full on or before December 31, 2022.   You will be provided with a contract which will require you to remit a deposit within 30 days.  Following payment, you will obtain title to a condominium (i.e. a new deed will be issued).  Time will be of the essence.  If you default, the unit will be sold to a third party (the Bankruptcy Court requires a default provision to be incorporated into the Bankruptcy Plan.  Titan has specifically demanded same).

OPTION NO. 2 (SALE WITH LEASE/PURCHASE OPTION):  Sale of the apartment to DCG for $175.00 per square foot.  In addition, DCG will extend to you a lease for at least 2 years at market rate plus the option to purchase the unit (provided that you are current with your lease payments) at a price 10% above DCG's acquisition costs plus reasonable closing costs associated with its acquisition and purchase (This is estimated at $10,000.00 but could vary).

OPTION NO. 3 (SALE VACANT WITH NO PURCHASE OPTION):  Sale of the apartment to DCG for $190.00 per square foot.  This option requires you to vacate.  DCG indicated that it is willing to work with shareholders to provide them with short term leases (ie 3-6 months) to permit them to relocate.  Upon vacating, provided the unit is vacant and "broom clean", DCG will pay an additional $5,000.00 in cash directly to the shareholder as "key money" regardless of the size of the apartment.

Each shareholder was provided with a response sheet, in the form annexed hereto as Exhibit B.

All but 4 shareholders provided the undersigned with a response. Those that did not respond were deemed to have accepted Option No. 3. A list of options chosen which contains the proposed purchase price is annexed hereto as Exhibit C.

In sum, the Debtor received the following responses:

Option 1 – 1 Shareholder (615 Warburton)

Option 2 – 13 Shareholders

Option 3 – 10 Shareholders

## The DCG Contracts

Based upon the foregoing, DCG presented the Debtor with two form contracts, one reflecting the purchase pursuant to the terms outlined in Option No. 2 (the "Lease

Option Contract") and the other reflecting the terms outlined in Option No. 3 (the "Vacate Option Contract"). A form of the Lease Option Contract is annexed hereto as Exhibit D. The form of the Vacate Option Contract is annexed hereto as Exhibit E.

The purchase price under the Lease Option Contract is $2,166,675.00. The purchase price under the Vacate option contract is $1,872,640.00. Together, the sales will result in a gross purchase price of $4,039,315.00. As explained below, this amount is more than sufficient to satisfy claims and will likely result in a significant surplus to Shareholders. The surplus could exceed $1,000,000.00.

## 615 Warburton

615 Warburton held or holds an interest in several Apartments in the Building[1]. It is owned and controlled by Guerrero. Two of the Apartments were sold pre-petition. At the time of the sale of two Apartments, Titan demanded that all proceeds be paid to it rather than agreeing to a "release price" as it did with other sellers. Instead, Titan insisted on retaining the entire net proceeds including amounts that 615 Warburton was entitled to. This resulted in 615 Warburton paying more than its proportionate share of amounts due to Titan. According to 615 Warburton, such payment to Titan was without prejudice to it asserting a claim against the Debtor for the overpayment. 615 Warburton has asserted Claim numbered 5 against the Debtor in the amount of $121,000.00 representing the amount it paid Titan over the value of its "release price."

Rather than accept a cash payment, 615 Warburton will receive a full credit towards the purchase of Apartment numbered 5L, which is currently owned by Guerrero. 615 Warburton will waive any further right to payment on its Claim. It is submitted that such credit or set off of amounts due to 615 Warburton by the Debtor against the amount

---

[1] 615 Warburton sold two Apartments pre-petition (5N and 5M) and currently holds shares assigned to one Apartment (7L). Its principal, Guerrero, holds shares assigned to Apartment 5L.

that it, or Guerrero, would be required to pay under Option No. 1 is fair and equitable and consistent with Section 553 of the Bankruptcy Code.

## The Debtor's Assets and Operations

The Debtor's assets consist of the twenty-four (24) Apartments, the Apartment occupied by the Building superintendent and limited common areas. They are worth approximately $4 million. A liquidation analysis is annexed hereto as Exhibit F.

## Claims

The Claims bar date for non-governmental entities was September 16, 2022. Five (5) entities filed proofs of Claim. Copies of a claims analysis and the official claims register are together annexed hereto as Exhibit G. Buckingham Tower is the Condo Association which is owed back maintenance. 615 Warburton is a prior owner of Apartments.

Titan has not filed a proof of claim. It is estimated that $2,300,000.00 is due and owing. Yonkers has also not filed a proof of claim. Yonkers provided the undersigned with a print out of amount alleged to be due. A copy is annexed hereto as Exhibit H. According to Yonkers, approximately $265,000.00 remains due and owing. The Debtor is reviewing the information provided by Yonkers and reserves the right to object to same.

The funds generated by the sale of the Apartments are more than sufficient to satisfy Titan and all other creditors.

## Liquidation Analysis

To confirm the Plan, the Bankruptcy Court must find that all holders of Allowed Claims will receive at least as much under the Plan as they would receive in a Chapter 7 liquidation. The Debtor's Schedules on file with the Bankruptcy Court list the Debtor's Property, which would be subject to liquidation in a Chapter 7. The Debtor's sole assets

include the twenty-five (25) Apartments.

Under the Plan, creditors and Shareholders will receive more than they would receive in a Chapter 7 liquidation. As demonstrated on <u>Exhibit F</u>, recovery would be diluted by auctioneer's fees, other costs of sale and a Chapter 7 trustee's commission. Distribution to Shareholders would be significantly lower in a Chapter 7.

Under the Plan, the Debtor proposes to pay Titan with the proceeds from the apartments which will yield approximately $4.00 million. The Debtor will pay administrative claims directly. As noted above, this sum is greater than any reasonably projected recovery in a liquidation of the Debtor's business.

## **The Plan**

(a) <u>Introduction</u>

The Debtor explored various alternatives to the Plan including (i) re-negotiating a long term payout with Titan; (ii) refinancing the obligation to Titan; (iii) auction of the Apartments and (iv) private sale of the Apartments. Titan was unwilling to engage in any further forbearance explaining that it had already engaged in forbearance for more than 10 years. Efforts to refinance were futile. As such, a sale or auction became the only viable alternatives.

The Debtor presented various options to the Shareholders and considered their preferences. DCG, which owns other Units in the Building, was willing to enter into an agreement consistent with the Shareholder's preferences.

(b) <u>Funding</u>

The Debtor will fund the Plan with the proceeds from the Apartments to DCG. Payment to Titan, the most active creditor, would be made on or before December 31, 2022. Payment to other creditors will follow promptly.

(b) <u>Projected Recovery of Avoidable Transfers</u>

The Debtor is not aware of preference, fraudulent conveyance or any other avoidable transfers to be pursued. Moreover, since creditors will be paid in full, any requirement of 'insolvency" would not be met.

### ARTICLE III
### <u>DESIGNATION OF CLAIMS AND INTERESTS</u>

All Claims and Interests, of whatever nature, whether or not scheduled or liquidated, absolute or contingent, whether resulting in an Allowed Claim or not, shall be bound by the provisions of the Plan and are hereby classified as follows:

**Class 1** shall consist of the Debtor's liability to Titan.

**Class 2** shall consist of amounts due to Yonkers for real property taxes.

**Class 3** shall consist of the claim of 615 Warburton.

**Class 4**–shall consist of all Allowed Priority Claims. The IRS filed a claim against the Debtor in the amount of $21,581.65 of which $16,252.11 is entitled to priority. NYS filed a claim against the Debtor in the amount of $5,863.14 of which $1,694.93 is entitled to priority. It is for tax withholdings for 2020 and 2021.

**Class 5**–shall consist of all other Unsecured Claims.

**Class 6** shall consist of Equity - the Allowed Interests. Currently, all Allowed Interests are held by the Shareholders

In accordance with section 1123 (a)(1) of the Bankruptcy Code, Administrative Claims have not been classified.

### ARTICLE IV
### <u>TREATMENT OF CLAIMS UNDER THE PLAN</u>

1      **Satisfaction of Claims.** The treatment of and consideration to be received by holders of Allowed Claims shall be in full satisfaction, release and discharge of their

respective claims against the Debtor.

2.  **Allowed Administrative Claims**

(A)(i) Administrative expenses incurred by the Debtor in the ordinary course of business following the Petition Date are expected to be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade creditors. Any other Allowed Administrative Claims, with the exception of Administrative Claims of Professionals *(including* the SubChapter V Trustee) shall be paid in full in cash from the Plan Fund on or before one business day after the Effective Date, or upon such other terms as agreed upon by the Debtor and the holder of such Claim.

(ii)     Allowed Administrative Claims of Professionals shall be paid in full in cash one business day after allowance by the Bankruptcy Court pursuant to section 330 of the Bankruptcy Code, or upon such other terms as agreed upon by the Debtor and the Professional.

The Debtor shall pay Allowed Administrative Claims from the Plan Fund.

Allowed Administrative Claims are estimated to total approximaetly $150,000.00.

3.  **Class 1 – Titan**

Titan shall be paid in full in Cash from the proceeds of the sale of the Apartments at the time of the closing or within 5 days thereof.   Any disputed portion of Titan's claim shall be held in escrow pending resolution of such amount consistent with Article VI hereof.

Titan is unimpaired under the Plan and not entitled to vote to accept or reject the Plan.

4.  **Class 2 – Yonkers**

Yonkers shall be paid in full in Cash from the proceeds of the sale of the

Apartments at the time of the closing or within 5 days thereof. Any disputed portion of Yonkers' claim shall be held in escrow pending resolution of such amount consistent with Article VI hereof.

Yonkers is unimpaired under the Plan and not entitled to vote to accept or reject the Plan.

5. **Class 3 – 615 Warburton**

615 Warburton shall receive the Warburton Apartment (5L) free and clear of any liens in full satisfaction of its Claim numbered 5. 615 Warburton will waive any right to a deficiency payment on Claim numbered 5. Notwithstanding the foregoing, 615 Warburton maintains its rights, if any, to receive a share of the Distribution to Class 5 Interest Holders under this Plan.

615 Warburton is unimpaired under the Plan and not entitled to vote to accept or reject the Plan.

6. **Class 4 – Priority Claims**

Allowed Priority Claims shall either be paid in full in Cash or reserved for in full within ten (10) business days after the Effective Date. Holders of Priority claims shall be entitled to post-petition interest on amounts due.

Class 4 Claims are unimpaired under the Plan and not entitled to vote to accept or reject the Plan.

7. **Class 5 - General Unsecured Claims**

Allowed General Unsecured Claims shall either be paid in full in Cash or reserved for in full within ten (10) business days after the Effective Date. Holders of Class 5 general unsecured claims shall be entitled to post-petition interest on amounts due.

Class 5 Claims are unimpaired under the Plan and not entitled to vote to accept or reject the Plan.

8.    **Class 6 – <u>Equity Interests of the Shareholders</u>**

The Shareholders shall be paid their proportionate share of the remaining balance after all creditors including holders of Administrative Claims, Titan, Yonkers, 615 Warburton, holders of Priority Claims and holders of General Unsecured Claims are satisfied.

The amount due to each Shareholder shall be determined with reference to the price paid by DCG for their Apartment and may vary depending upon whether the Shareholder elected to take Option No. 1, Option No. 2, or Option No. 3. Any amounts due to the Debtor from a Shareholder (i.e. unpaid common charges) will be deducted.

Within 90 days of the consummation of the sale of the Apartments to DCG, each Shareholder shall be provided with a proposed distribution schedule and will be afforded a reasonable opportunity to object to same. This 90 day period may be extended by the Court for cause shown.

In the event that disputes arise in connection with the Distribution to Shareholders, the Court, in its discretion, may appoint a plan administrator to investigate and report to the Court with compensation to be paid upon application to the Court. The SubChapter V Trustee may serve as such plan administrator.

The Shareholders' interests shall be extinguished contemporaneously with receipt of a Distribution hereunder.

Class 6 interests are unimpaired under the Plan and are deemed to have accepted the

Plan.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
### Assumption and Assignment of Executory Contracts and Unexpired Leases.

a.   On the Effective Date, any Executory Contracts and Unexpired Leases to which Debtor is a party shall be deemed rejected in accordance with section 365 of the Bankruptcy Code.  The Debtor is not aware of any executory contracts or leases other than propriety leases with Shareholders.  Any propriety leases shall be rejected and deemed cancelled on the Confirmation Date.

b.   **Rejection Claims.** Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease of the Debtor (other than the lease for the Suffern Location) pursuant to the Plan shall be treated as General Unsecured Claims.

c.   **Bar Date for Rejection Claims.** A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtor's counsel within 30 days after the later of (i) the date of notice of the entry of a Final Order approving such rejection (unless such Final Order expressly provides a bar date with respect to such claim, in which event no Proof of Claim with respect to such claim shall be deemed timely unless it is filed with the Bankruptcy Court and served in the manner provided in such Final Order), or (ii) notice of the Confirmation Date. Any such claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtor or the Property.

**ARTICLE VI**
**IMPLEMENTATION OF THE PLAN**

a.        **Implementation.** The Debtor shall take all necessary steps and perform all necessary acts to consummate the terms and conditions of the Plan; and shall comply with all orders of the Court, including paying the Plan Fund as provided in the Plan. The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, directing the Debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect the Plan.

b.        **Funding.** Except as set forth elsewhere in the Plan, all payments required to be made under the Plan shall be made by the Disbursing Agent from the proceeds of the sale of the Apartments and cash on hand.


**ARTICLE VII**
**PROVISIONS GOVERNING DISTRIBUTIONS**

a.        **Disbursing Agent.** The Debtor shall serve as the Disbursing Agent and shall make all distributions under the Plan. This shall be true even if the Plan is confirmed pursuant to section 1191(b) of the Bankruptcy Code.  (Pursuant to section 1194(b) of the Bankruptcy Code, if a Plan is confirmed pursuant to section 1191(b), the Trustee shall make payments under the plan, "…except as otherwise provided in the Plan or in the order confirming the plan…") The size and scope of this case does not justify the continued expense of a Trustee.

b.        **Timing of Distributions under the Plan.** Any payments to be made pursuant to the Plan on account of any non-disputed claim, and subject to other limitations noted, shall be made by the time stated in the Plan.

c.        **Objection Deadline.** Unless otherwise ordered by the Bankruptcy Court,

for cause, the Debtor may file and serve any objection to any claim at any time, but in no

event after the later to occur of (i) 90 days after the Effective Date, or (ii) 90 days after

the date proof of such claim or a request for payment of such claim is filed.

d. **Prosecution of Objections.** After the Confirmation Date, only the Debtor

and the Disbursing Agent shall have authority to file, compromise, withdraw or litigate to

judgment objections to disputed claims. The Debtor and the Disbursing Agent shall have

the right to litigate to judgment, settle or withdraw any objections to any claim or

Interest.

e. **No Distribution Pending Allowance.** Notwithstanding any other

provision of the Plan, no payment shall be made with respect to any portion of a disputed

claim unless and until all objections to such claim are resolved by Final Order.

f. **Distribution After Allowance.** Within 15 days after the entry of a Final

Order resolving an objection to a disputed claim, the Disbursing Agent shall make

distributions, to which a holder is then entitled with respect to any formerly disputed

claim that has become an Allowed Claim.

**ARTICLE VIII**
**DEFAULT**

In the event that the Debtor fails to meet its obligations hereunder,

including any failure to pay Titan the undisputed portion of what is due on or before

December 31, 2022, any party in interest may serve a notice of default upon the Debtor

by sending notice of such default and an opportunity to cure upon (i) the Debtor by

electronic mail to counsel at anne@pmlawllp.com and (ii) by first class mail to counsel

for the Debtor, Anne Penachio, at her office Penachio Malara LLP, 245 Main Street, Ste

450, White Plains, NY 10601 and the Debtor c/o Jose Guerrero, 615 Warburton Avenue,

Yonkers, New York 10701. The Debtor shall be afforded 14 days from the date on

which the notice is sent to cure any default. Should the Debtor fail to cure a default, within such 14 days (or secure an extension from the Court for cause shown), the Debtor shall retain an auctioneer to sell the Apartments and promptly (within 20 days) move for approval of the retention of an auctioneer and bid procedures for the sale of the Apartments.

In the event that the sale to DCG is not fully consummated by January 15, 2023, the Debtor, in conjunction with the SubChapter V Trustee, shall take steps to retain an auctioneer to sell the Apartments and, on or before January 31, 2023, move for approval of the retention of an auctioneer and bid procedures for the sale of the Apartments. In the event that the Debtor fails to retain an auctioneer and seek approval of bid procedures on or before January 31, 2023, the SubChapter V Trustee or Titan may move for such approval and undertake to sell the Apartments. In any proposed bid procedures, DCG and/or Affiliates, as that term is defined in 11 U.S.C §101(2)(A), may be precluded from bidding.

## ARTICLE IX
## INJUNCTION AND EXCULPATION
## AND RELEASE

a.     **Injunction.** Except (i) as otherwise provided in the Plan or (ii) in any Final Order entered by the Bankruptcy Court, all persons who have held, hold, or may hold claims against, the Debtor that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from the commencement or continuation of any action, the employment of process, from taking any act to collect, enforce, attach, recover or offset against such claim and taking any act to create, perfect or enforce any lien or encumbrance against property of the estate which is to be distributed to creditors under this Plan.

b.        **Limitation of Liability**. Neither the Debtor, nor any of its officers, trustees, Board Members, or employees (acting in such capacity) nor any professional person employed by any of them shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the case or the Plan, except in the case of fraud, gross negligence, willful misconduct, malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts.

Nothing in this Section 7.2 shall limit the liability of Professionals pursuant to DR 6-102 of the Code of Professional Responsibility.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

a.        **Orders in Aid of Consummation.** Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code the Bankruptcy Court may enter one or more orders in aid of Confirmation directing the implementation of matters or actions required by the Plan.

b.        **Due Authorization by Creditors.** Each and every creditor that accepts the Distributions provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Plan and that there are no outstanding liens, encumbrances, commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights released, conveyed or modified by the Plan, or obligations undertaken by such creditor under the Plan.

c.    **Amendments.** The Plan may be altered, amended or modified by the Debtor, in writing, signed by the Debtor, at any time before the substantial consummation of the Plan, as provided in Section 1193 of the Bankruptcy Code.

d.    **Revocation.** Subject to the requirements of the Bankruptcy Code and Bankruptcy Rules, the Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If the Plan is revoked or withdrawn or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any claims by or against the Debtor; or (ii) prejudice in any manner the rights of the Debtor or any other party in any further proceedings involving the Debtor or its Estate.

e.    **Filing of Additional Documents.** Except as otherwise provided in the Plan, on or before the Effective Date, the Debtor may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, and Debtor shall be responsible for the preparation and filing of any reports necessary until the entry of a Final Decree.

f.    **Successors and Assigns.** The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

g.    **Notices.** All notices and other communications to be given or made hereunder shall be in writing and shall be delivered by electronic mail and either (i) personally, (ii) by certified mail or national recognized overnight service to the addresses specified, or pursuant to change of address as filed on ECF, or  (iii) as directed in writing by an interested party herein:

(1)     if to the Debtor to Anne Penachio, Penachio Malara LLP, 245 Main Street, Suite 450, White Plains, NY 10601; [anne@pmlawllp.com](mailto:anne@pmlawllp.com)

(2)     if to the Sub-Chapter V Trustee, Heidi J. Sorvino, White and Willaims, LLP, 7 Times Square, Suite 2900, New York, NY 10036, [sorvinoh@whiteandwilliams.com](mailto:sorvinoh@whiteandwilliams.com)

(3)     if to any creditor at (i) the addresses set forth on the respective Proofs of Claim filed by such holders; (ii) the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (iii) the address reflected in the Schedules if no Proof of Claim is filed and the Disbursing Agent has not received a written notice of a change of address;

(4)     if to any Entity that has filed a notice of appearance, at the address set forth on such notice of appearance.

h.     **Governing Law.** Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other Federal law are applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of New York.

i.     **Other Actions.** Nothing contained herein shall prevent the Debtor or creditors from taking such actions as may be reasonably necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan.

j.     **Severability.** In the event any provision of the Plan is determined to be unenforceable such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Plan.

k.     **Avoidance Actions.** The Debtor is not aware of any claims to avoid transfers. Any such avoidance claims are preserved solely as a defense to any Claim

asserted against the Debtor's Estate.

# ARTICLE XI
## RETENTION OF JURISDICTION

**Retention of Jurisdiction.** Notwithstanding the entry of the Confirmation Order or the Occurrence of the Effective Date, until the Case is closed, the Bankruptcy Court shall retain and have original, but not exclusive, jurisdiction to:

(a)- Insure that the Plan is consummated, and to enter any Order pursuant to section 1142(b) of the Bankruptcy Code, to compel the Debtor and any other necessary party, to take such action and execute such documents to effectuate the Plan;

(b) Consider any modification of the Plan proposed pursuant to section 1193 of the Bankruptcy Code;

(c) Allow, disallow, determine, liquidate, classify or establish the priority, secured or unsecured status of any Claim, including without limitation, the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of claims, and the resolution of any adversary proceeding;

(d) Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for any period ending on or before the Effective Date;

(e) Resolve any motions pending on the Effective Date to assume, assume and assign or reject any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and if necessary, liquidate, any and all claims arising therefrom;

(f) Ensure that distributions to holders of Allowed Claims

are accomplished pursuant to the provisions of this Plan;

(g)     Decide or otherwise resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters or grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(h)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan and Disclosures made herein or to enforce all orders, judgments, injunctions, and rulings entered in connection with the case, including, but not limited to any order necessary to enforce the provisions of the Plan;

(i)      Resolve any and all controversies, suits or issues that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligation incurred in connection with the Plan;

(j)      Remedy any defect or omission or reconcile any inconsistency in any order, the Plan, or any contract, instrument, release or other agreement or document created in connection with the Plan, to the extent authorized herein or in the Bankruptcy Code;

(k)     Issue any injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

(l)      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)     Determine any dispute arising under or related to the Plan, including, without limitation, any dispute concerning the scope or effect of any release or

discharge provided for by the Plan or the Confirmation Order;

        (n)     Determine any other matters that may arise in connection with or relate to the Plan, or the disclosures made therein, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan; and

        (o)     Enter an order or Final Decree concluding this case.

**Post-Closing Jurisdiction.** Notwithstanding the entry of a final decree or an order closing this case, the Bankruptcy Court shall retain jurisdiction to reopen this case for the purpose of enforcing, by injunction or otherwise, the terms of the Plan, the Confirmation Order and any final decree, including, without limitation, the enforcement of any rights of the Debtor.

## ARTICLE XII
## <u>CONDITION TO THE EFFECTIVE DATE</u>

**Condition Precedent to Effectiveness.** The Plan shall not become effective unless and until the Confirmation Order has become a Final Order.

## ARTICLE XIII
## <u>DISCHARGE</u>

On the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before Confirmation of the Plan, to the **fullest** extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:

      (i)     imposed by this Plan; or
      (ii) to the extent provided in § 1141(d)(6).

## ARTICLE XIV
## CLOSING THE CASE

a.       **Substantial Consummation.** Until the occurrence of the Effective Date

and substantial consummation of the Plan, the Debtor, its property and its creditors shall

be subject to further orders of the Bankruptcy Court.

b.       **Closing the Case.** Upon the substantial consummation of the Plan, the

Debtor shall expeditiously move for the entry of Final Decree closing the case and such

other relief as may be just and appropriate.

Dated:  White Plains, NY
         September 27, 2022

                        Penachio Malara LLP

                        /s/ Anne Penachio
                        Anne Penachio, Esq.
                        245 Main Street, Suite 450
                        White Plains, NY  10601
                        (914) 946-2889

                        /s/ Jose Guerrero
                        Jose Guerrero