# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** ("Agreement") is made the -----day of ----- 2022 (the "Effective Date") by and between _____ ("Seller"), and 615 Warburton 3 LLC, a New York limited liability company ("Purchaser").

In consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Seller and Purchaser, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1.   "Closing Date" shall mean the Ninetieth (90th) day from the Effective Date except that if said day is not a business day, then the Closing Date shall be the next business day thereafter.

"Purchase Price" shall mean the purchase price Purchaser shall pay to Seller for the Property (defined in Section 2.1 below), which shall equal two million, one hundred, sixty six thousand, six hundred seventy five  Dollars ($2,166,675.00).

Section 1.2.   "Buyback Option" – the named owner in Exhibit B shall have the right to Buyback its individual unit as listed in Exhibit B for the Buyback Option Price in each year of the two year lease at the amount pre-determined in Exhibit B.

## ARTICLE II
## PURCHASE AND SALE; CLOSING

Section 2.1.   Purchase and Sale.  In consideration of the payment of the Purchase Price by Purchaser to Seller and for other good and valuable consideration, Seller hereby agrees to sell to Purchaser, and Purchaser hereby agrees to purchase from Seller, all of the following (collectively, the "Property"), subject to and in accordance with the terms and conditions of this Agreement:

(a)   "Real Property" shall mean that certain parcel of land located at 615 Warburton Ave, Yonkers New York as more particularly described on **Exhibit A** hereto, consisting of 85 legal condominium apartments as evidenced by the survey and Certificate of Occupancy together with all easements, rights of way, privileges, licenses and appurtenances which Seller may now own or hereafter acquire with respect thereto; Purchaser is buying

| | | | |
|---|---|---|---|
| (i) | 7F | Jacqueline Brown | $140,700.00 |
| (ii) | 7K | Lanny Lerner | $169,575.00 |

1

|       |                          |              |
|-------|--------------------------|--------------|
| (iii) | 2E/F Eloise President    | $275,450.00  |
| (iv)  | 3K Mari da Silva         | $169,575.00  |
| (v)   | 4D Katherine Robertson   | $144,725.00  |
| (vi)  | 4J Adel Morales          | $169,750.00  |
| (vii) | 6N Evelyn Slusher        | $112,875.00  |
| (viii)| 7C Richard Brown         | $126,875.00  |
| (ix)  | 7D Rosalind Rogers       | $144,725.00  |
| (x)   | 7L 615 Warburton Holding | $198,100.00  |
| (xi)  | 1L Gabriella Bracaglia   | $198,100.00  |
| (xii) | 5K James Jackson         | $169,575.00  |
| (xiii)| 6G Greg Dusablon         | $146,650.00  |

Total -                                  $2,166,675.00

Full unit details and rent listed in **Exhibit B.**

(b)     "Improvements" shall mean all buildings, fixtures, structures and improvements situated on, affixed, trade names, branding, pictures, advertisements, IP or appurtenant to the Real Property; and

Section 2.2.    Closing.  The purchase and sale of the Property shall be consummated at a closing (the "Closing") to be held at the offices of Purchaser's title company, or via mail at 10:00 a.m., local time, on the Closing Date, or in another mutually agreeable manner and location.

Section 2.3.    Purchase Price.  Purchaser shall pay the Purchase Price as follows:

(a)     Ten Thousand and No/100 Dollars ($100,000.00) (the "Deposit") by wire transfer or check payable to Riverside Abstract ("Title Company"), which Purchaser shall deliver to Title Company on even date hereof.

(b)     The balance of the Purchase Price shall be paid by Purchaser to (or at the direction of) Seller at the Closing by wire transfer of immediately available funds (or, at the election of Seller, by Title Company check), subject to adjustment as provided in this Agreement.

# ARTICLE III
## PURCHASER'S DUE DILIGENCE

Section 3.1.    <u>Title Matters</u>.

(a)    Title to the Real Property shall be good and marketable and free and clear of all liens, claims and encumbrances, excepting only the rights of parties in possession under and subject solely to the terms of the Leases and the following permitted encumbrances (collectively, the "<u>Permitted Encumbrances</u>" and each a "<u>Permitted Encumbrance</u>"): (i) liens for taxes, assessments and governmental charges not yet due and payable or due and payable but not yet delinquent, subject to adjustment as required by this Agreement; (ii) applicable zoning regulations and ordinances provided the same do not prohibit or impair use of the Property as currently operated and constructed or as contemplated by this Agreement; and (iii) such other encumbrances of record as of the Effective Date in the applicable recording office with respect to such Property which are not objected to by Purchaser as Defects in accordance with this Agreement.

(b)    Promptly after the Effective Date, Purchaser shall order from Title Company and direct Title Company promptly to deliver to Purchaser and Seller a preliminary title commitment, for an owner's policy of title insurance with respect to the Property, together with complete and legible copies of all instruments and documents referred to as exceptions to title (the "<u>Title Commitment</u>").

# ARTICLE IV
## CONDITIONS TO PURCHASER'S OBLIGATION TO CLOSE

The obligation of Purchaser to acquire the Property on the Closing Date shall be subject to the satisfaction of each of the following conditions precedent on and as of such Closing Date:

Section 4.1.    <u>Closing Documents</u>.  The Seller shall have delivered to Purchaser (or Title Company, as applicable) the following:

(a)    A special warranty deed for the Real Property and the Improvements thereon, in proper statutory form for recording, duly executed and acknowledged by Seller, free from all liens and encumbrances other than the Permitted Encumbrances;

(b)    The Unit is being conveyed as a Condominium Unit free and clear of all Co-Op liens, dues and unpaid common area charges

(c)    A Non-foreign Person Certification in the form as required under Section 1445 of the Internal Revenue Code;

(d)    A Payoff for Sellers pro-rata share of the Titan Capital Loan

(e)    All keys and combinations to locks at the Improvements to the extent in Seller's possession or control;

(f)     A resolution, certificate or other commercially reasonable documentation executed by the general partner of Seller evidencing the authority of Seller to convey the Property and the capacity of the signatory for Seller.

(g)     Seller Shall continuously provide all reasonably requested information for Purchasers Lender up until the date of Closing

(h)     The representations of Seller set forth in this Agreement shall be true and correct as of the date of this Agreement and shall be true and correct as of the date of Closing in all material respects except as otherwise specified.

(i)     Unit must be delivered vacant or with a signed lease between the Unit holder and Purchaser, sample lease provided in Exhibit C, not to exceed two years months of term at the rent provided for in Exhibit B

Section 4.2.   <u>Actions Affecting Property</u>.  Between the date of this Agreement and the Closing, Seller shall not allow or permit the imposition of any liens, judgments or other encumbrances which affect title to the Property in any manner, which are not removed as of the Closing Date, without the prior written approval of Purchaser (not to be unreasonably withheld). Seller, in accordance with its normal practices and procedures, will continue to maintain and to make all ordinary and non-structural repairs and replacements to the Property so as to keep the Property in substantially its present condition, reasonable wear and tear excepted and Seller shall operate and manage the Property in the same manner as it has operated under its current budget.

Section 4.3.   <u>Representations and Warranties</u>.  Each of the Seller's representations and warranties contained in this Agreement shall be true and correct in all material respects on the date of this Agreement (or, Seller shall take such actions to make any such representations true and correct in all material respects as of the Closing Date) and on the Closing Date.

Section 4.4.   <u>No Termination</u>.   Purchaser shall not have validly terminated this Agreement in accordance with the terms hereof.

Section 4.5   <u>Titan Loan.</u> The Seller shall receive a payoff from Titan Capital for its pro-rata share of the current loan on the Co-Op association.

If any of the conditions set forth herein are not fulfilled or otherwise waived by Purchaser, then Purchaser shall not have the obligation to complete closing hereunder and the Deposit shall promptly be returned to Purchaser, and the parties shall have no further liability hereunder.

ARTICLE V
CONDITIONS TO SELLER'S OBLIGATION TO CLOSE

The obligation of Seller to convey the Property on the Closing Date to Purchaser is subject to the satisfaction of the following conditions precedent on and as of such Closing Date:

Section 5.1.   <u>Purchase Price</u>.  The Purchaser shall deliver to Seller the Purchase Price payable hereunder, adjusted as herein provided.

Section 5.2.    Closing Documents.  The Purchaser shall have delivered to Seller (or Title Company, as applicable) duly executed and acknowledged counterparts of the documents described in Section 4.1 above, as applicable, together with such other conveyance documents, certificates, affidavits and other instruments as Seller or Title Company may reasonably require and as are customary in like transactions in the greater New York Metropolitan area.

Section 5.3.    Accuracy of Representations.  All of the representations and warranties of Purchaser contained in this Agreement shall have been true and correct in all material respects when made, and shall be true and correct in all material respects on the date of Closing with the same effect as if made on and as of such date.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLER

To induce Purchaser to enter into this Agreement and to complete the sale and purchase of the Property hereunder, Seller represents and warrants to Purchaser as follows as of the Effective Date and as of Closing:

Section 6.1.    Status and Authority of Seller.  Seller is a limited liability company duly organized, validly existing and subsisting under the laws of its state of formation, and has all requisite power and authority under the laws of such state to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

Section 6.2.    Action of Seller.  Seller has (or by the Closing Date will have) taken all necessary action to authorize the execution, delivery and performance of this Agreement, and upon the execution and delivery of any document to be delivered by it on or prior to the Closing Date, such document shall constitute the valid and binding obligation and agreement of said party, enforceable in accordance with its terms.

Section 6.3.    Not a Foreign Person.  The Seller is not a "foreign person" within the meaning of Section 1445 of the United States Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

The foregoing representations and warranties of Seller shall not survive Closing.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

To induce Seller to enter in this Agreement, Purchaser represents and warrants to Seller as follows:

Section 7.1.    Status and Authority of Purchaser.  Purchaser is a limited liability company duly organized and validly existing under the laws of the New York and has all requisite power and authority under the laws of such state under its operating agreement to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

Section 7.2.    Action of Purchaser.  Purchaser has taken all necessary action to authorize the execution, delivery and performance of this Agreement, and upon the execution and delivery of any document to be delivered by Purchaser on or prior to the Closing Date such document shall constitute the valid, binding obligation and agreement of Purchaser, enforceable against Purchaser in accordance with its terms.

The foregoing representations and warranties of Purchaser shall not survive Closing.

ARTICLE VIII
COVENANTS OF THE SELLER

Seller hereby covenants with Purchaser between the date of this Agreement and the Closing Date that Seller shall continue to operate the Property as currently operated in a businesslike manner consistent with its past practices, including, without limitation, entering into any residential leases (or extensions of existing leases) in the ordinary course of business with third parties for apartment units in the Improvements and maintaining its existing insurance coverages through the Closing Date.

ARTICLE IX
APPORTIONMENTS; TAXES; EXPENSES

Section 9.1.    Apportionments.  Except as otherwise specifically provided below, all expenses and obligations relating to the operation of the Property (including, without limitation, costs, expenses and obligations arising pursuant to the Leases; real estate taxes; Contracts; and any annual license or permit fees relating to the Property) shall be pro-rated between Purchaser and Seller as of midnight of the day preceding the date of Closing, including the following:

(a)    Taxes.  All real estate taxes, charges and assessments affecting the Property shall be prorated on a per diem basis as of midnight of the day preceding the date of Closing, disregarding any penalty and on the basis of the fiscal year of the authority levying the same.  If any of the same have not been finally assessed, as of the date of Closing, for the current fiscal year of the taxing authority, then the same shall be adjusted at Closing based upon the most recently issued bills therefor, and shall be re-adjusted promptly after final bills are issued after the Closing.

(b)    Utilities.  Charges for water, electricity, sewer rental, gas, telephone and all other utilities shall be prorated on a per diem basis as of midnight of the day preceding the date of Closing

Section 9.2.    Expenses.  Except otherwise provided herein, each party will pay all its own expenses incurred in connection with this Agreement and the transactions contemplated hereby, including, without limitation, (1) all costs and expenses stated herein to be borne by a party, and (2) all of their respective accounting, legal and appraisal fees.  Seller shall pay all realty transfer taxes in connection with this transaction.  Purchaser, in addition to its other expenses, shall pay for (a) all recording charges incident to the recording of the deeds for the Real Property, and (b) all title insurance premiums and any desired endorsements.

# ARTICLE X
## ASSIGNMENT AND ASSUMPTION OF LEASE OBLIGATIONS.

Subject to the terms and conditions of this Agreement, Seller shall assign to Purchaser or to Purchaser's nominee at Closing all of its right, title and interest in and to the Leases and Purchaser shall assume and agree to perform Seller's duties and obligations thereunder accruing on and after the date of Closing.

# ARTICLE XI
## DEFAULT

Section 11.1. <u>Default by Seller</u>. If Seller shall fail to perform any of the material covenants and agreements contained herein to be performed by it and such failure continues for a period of three (3) business days after notice thereof from Purchaser (except that no such notice shall be required for Seller's failure to attend Closing and consummate the transaction contemplated by this Agreement), Purchaser may, as its sole and exclusive remedies, (i) terminate this Agreement whereupon the Deposit shall be returned to Purchaser and the parties shall have no further rights and obligations hereunder, or (ii) seek specific performance of this Agreement.

Section 11.2. <u>Default by Purchaser</u>. If Purchaser shall fail to perform any of the covenants and agreements contained herein to be performed by it and such failure shall continue for a period of three (3) business days after notice thereof from Seller (except that no such notice shall be required for Purchaser's failure to attend Closing and consummate the transaction contemplated by this Agreement and/or Purchaser's failure to pay the Deposit in a timely manner as required under this Agreement), Seller shall, as its sole and exclusive remedy, terminate this Agreement and recover the Deposit as liquidated damages, whereupon the parties shall have no further rights and obligations hereunder. The damages that Seller would sustain as a result of any such termination would be substantial but would be impracticable and excessively costly and difficult to establish or ascertain and the parties hereto agree that Seller's sole remedy at law and in equity, shall be to recover the Deposit as liquidated damages and not as a penalty.

# ARTICLE XIV
## MISCELLANEOUS

Section 14.1. <u>Notices</u>. All notices and other communications required or permitted under this Agreement shall be deemed adequately given if in writing and the same shall be delivered either (i) in hand, or (ii) by mail or Federal Express or similar expedited commercial carrier, or (iii) via electronic mail or facsimile, addressed to the recipient of the notice, postpaid and registered or certified with return receipt requested (if by mail), or with all freight charges prepaid (if by Federal Express or similar carrier). All notices required or permitted to be sent hereunder shall be deemed to have been given for all purposes of this Agreement upon the date of receipt or refusal, except that whenever under this Agreement a notice is either received on a day which is not a business day, the day of receipt or required delivery shall automatically be extended to the next business day. All such notices shall be addressed,

If to Seller:

If to Purchaser:

615 Warburton 3 LLC
c/o Dwight City Group
787 Eleventh Avenue, 10th Floor, New York, NY 10019
Attention: Judah L. Angster Esq./CEO
Email: ja@dwightcitygroup.com

By notice given as herein provided, the parties hereto shall have the right to change their respective addresses effective upon receipt by the other parties of such notice and each shall have the right to specify as its address any other address within the United States of America.

Section 14.4.   Severability.  If any provision of this Agreement shall be held or deemed to be invalid, inoperative or unenforceable as applied to any particular case in any jurisdiction or jurisdictions, this Agreement shall be reformed and construed in any such jurisdiction or case as if such invalid, inoperative or unenforceable provision had never been contained herein and such provision reformed so that it would be valid, operative and enforceable.

Section 15.5.   Counterparts, Etc.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and shall supersede and take the place of any other instruments purporting to be an agreement of the parties hereto relating to the subject matter hereof. This Agreement may not be amended or modified in any respect other than by the written agreement of Seller and Purchaser and, if an amendment or modification to Section 2.4, Title Company.  Signatures on this Agreement which are transmitted by electronically shall be valid for all purposes, however any party shall deliver an original signature on this Agreement to the other party upon request.

Section 14.6.   Governing Law.   This Agreement shall be interpreted, construed, applied and enforced in accordance with the laws of the New York, without regard to conflict provisions.

Section 14.7.   Performance on Business Days.  In the event the date on which performance or payment of any obligation of a party required hereunder is other than a business day, the time for payment or performance shall automatically be extended to the first business day following such date.

Section 14.8.   Possession.  Possession of the Property shall be given to Purchaser at Closing, free of any leases except the Leases and free of other claims to or rights of possession except the Tenants, by delivery of the deed.

Section 14.9.   Waiver of Tender of Deed and Purchase Monies.  The formal tender of an executed Deed by Seller and the tender by Purchaser of the portion of the Purchase Price payable at Closing are hereby mutually waived, but nothing herein contained shall be construed as a waiver of Seller's obligation to deliver the Deed and/or of the concurrent obligation of Purchaser to pay the portion of the Purchase Price payable at Closing.

Section 14.10. <u>Waiver of Trial by Jury</u>.    EACH PARTY HEREBY WAIVES, IRREVOCABLY AND UNCONDITIONALLY, TRIAL BY JURY IN ANY ACTION BROUGHT ON, UNDER OR BY VIRTUE OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED IN CONNECTION HEREWITH, THE PREMISES, OR ANY CLAIMS, DEFENSES, RIGHTS OF SET-OFF OR OTHER ACTIONS PERTAINING HERETO OR TO ANY OF THE FOREGOING.

Section 14.11 <u>Buyback Option.</u>    So long as the Lease Agreement between the Purchaser and unit owner as listed in Exhibit B are in good standing and the unit owner has made all monthly payments in a timely manner, the unit owner may, at the unit owners election, Buyback the unit it is renting from the 615 Warburton 3 LLC. The Buyback price listed on Exhibit B shall be based on the date the Buyback transaction is completed.  The owner exercising its Buyback option must cover all closing costs associated with the transaction and its pro rata share of all closing costs associated with this transaction. Notice must be given to 615 Warburton 3 LLC no later than 60 days prior the end each annual option. The Option shall automatically expire after two years or in the event of a default under the lease agreement.

Section 14.11. <u>Construction.</u>  The parties acknowledge that their attorneys have reviewed and negotiated the provisions of this Agreement; therefore, the rule of construction that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

[Remainder of Page Intentionally Left Blank; Signature Pages Follow]

IN WITNESS WHEREOF, the undersigned parties have caused this Agreement to be executed as of the date first above written.

SELLER:

**------------------------**

By:_____

    Name:
    Title:

PURCHASER:

615 Warburton 3 LLC

By: _____

    Name: Yehuda Angster Esq.

    Title: Managing Member

## **EXHIBIT A**

Legal Description of Real Property

# EXHIBIT B

| Unit Number | Owner | SF | Purchase Price | Rent | Buyback Year 1 | Buyback Year 2 |
|---|---|---|---|---|---|---|
| 7F | Jacqueline Brown | 804 | $140,700.00 | | $154,770.00 | $170,247.00 |
| 7K | Lanny Lerner | 969 | $169,575.00 | | $186,532.50 | $205,185.75 |
| 2E/F | Eloise President | 1,574 | $275,450.00 | | $302,995.00 | $333,294.50 |
| 3K | Mari da Silva | 969 | $169,575.00 | | $186,532.50 | $205,185.75 |
| 4D | Katherine Robertson | 827 | $144,725.00 | | $159,197.50 | $175,117.25 |
| 4J | Adel Morales | 970 | $169,750.00 | | $186,725.00 | $205,397.50 |
| 6N | Evelyn Slusher | 645 | $112,875.00 | | $124,162.50 | $136,578.75 |
| 7C | Richard Brown | 725 | $126,875.00 | | $139,562.50 | $153,518.75 |
| 7D | Rosalind Rogers | 827 | $144,725.00 | | $159,197.50 | $175,117.25 |
| 7L | 615 Warburton Holding | 1,132 | $198,100.00 | | $217,910.00 | $239,701.00 |
| 1L | Gabriella Bracaglia | 1,132 | $198,100.00 | | $217,910.00 | $239,701.00 |
| 5H | Jean Wilkinson | 1,130 | $214,700.00 | | $236,170.00 | $259,787.00 |
| 5K | James Jackson | 969 | $169,575.00 | | $186,532.50 | $205,185.75 |
| 6G | Greg Dusablon | 838 | $146,650.00 | | $161,315.00 | $177,446.50 |

# **EXHIBIT C**

Lease Agreement

# RESIDENTIAL APARTMENT LEASE
## THIS APARTMENT IS NOT SUBJECT TO RENT REGULATION

**Owner and Renter make this apartment lease agreement as follows:**

**Owner's Name:** 615 WARBURTON 3 LLC
**Owner's Address for Notices:** 244 W 54TH STREET, NEW YORK NY 10019

1.  **Renter's Name:**                          **Driver's License # (if any)** _____
    **Social Security #:**
2.  **Renter's Name:**                          **Driver's License # (if any)** _____
    **Social Security #:**
**Renter's Present Address:** _____
**Address of Premises to Be Rented:** 615 WARBURTON AVE, YONKERS NY 10701
**Apt. No:**          **Term of This Lease:**          **Monthly Rent Paid: $**

**Date of Lease:**          **Beginning:**          **Ending:**

1. **HEADINGS**: Paragraph headings are *only* for ready reference to the terms of this lease. In the event of a conflict between the text and a caption, the text controls.

2. **CONDITION "AS IS": a.** Renter acknowledges inspecting the apartment prior to signing this lease and accepts the apartment in the condition it is in as of such inspection. Renter acknowledges that the apartment is free of defects. Owner warrants that the apartment and building are fit for habitation and there are no conditions dangerous to health, life or safety. **b.** Photographs of apartment as of lease commencement are attached to this lease.

☐ **YES**     **NO** (check one)
☐

3. **USE AND OCCUPANCY OF APARTMENT**: The apartment is to be used and occupied for private residential purposes only, as the primary residence of Renter. The apartment may be occupied only by Renter named in this lease, Renter's immediate family, or other occupants in accordance with the applicable provisions of law. Renter agrees that the apartment will be occupied only by the following individuals, in addition to Renter.

**Name:**          **Birth Date:**     **Relation to Renter:**
XXXXXXXXXXXXXXXXX XXXXXXXXXXXX XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXX XXXXXXXXXXXX XXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXX XXXXXXXXXXXX XXXXXXXXXXXXXXXX

Renter is obligated to advise Owner, in writing, if any additional occupant moves into the apartment. Such notice must be furnished by Renter to Owner within 10 days of the date such additional occupant moves into the apartment. The apartment may not be occupied by more than the number of occupants permitted by law.

4. **RENTER'S POSSESSION OF APARTMENT**: Owner shall not be liable for failure to give Renter possession of the apartment on the beginning day of the lease term. Rent shall be payable as of the beginning of the term unless Owner is unable to give possession, in which case rent shall be payable as of the date possession is available. Owner must give possession within 30 days of the beginning day of the lease term. If not, Renter may cancel this lease and obtain a refund of money deposited. Owner will notify Renter as of the date possession is available. The

ending date of the lease term will not change in the event Owner is unable to give possession as of the beginning of the lease term. *If tenant's initial payment of first month's rent and security fails collection for any reason whatsoever, this lease shall be deemed null and void from its inception and of no further force and effect, all without any further action, notice or declaration.*

5. **RENT, ADDED RENT**: a. Rent payments for each month are initials _____ due on or before the first day of each month at the address above or at a location designated by Owner in writing. Notice from Owner to Renter that rent is due is not required. The rent must be paid in full without deductions. The first month's rent and

added rent must be paid when Renter signs this lease. b. Renter

may be required to pay other charges and fees to Owner under the terms of this lease. They are called 'added rent.' This added rent will be payable as rent, together with the next monthly rent due. If Renter fails to pay the added rent on time, Owner shall have the same rights against Renter as if Renter failed to pay rent.

6. **FAILURE TO PAY RENT ON DUE DATE**: Rent is due by the first day of each month. Payment after the 10th day of each month shall be considered a "late payment" Renter expressly agrees and understands that three (3) or more late payments in any twelve month period shall be deemed to be a failure to comply with a substantial obligation of this lease and be grounds for the termination of this lease and eviction of Renter by Owner.

7. **FEE FOR LATE PAYMENT**: Due to administrative inconvenience and costs incurred due to late payment of rent, Renter agrees to pay the sum of **$0.00** per month in any month in which the rent is tendered after the late payment date, as added rent. Although Owner is charging a late charge, Owner may commence any action or proceeding with regard to Renter's failure to pay timely rent. This paragraph is not a waiver of Owner's right to collect or demand rent.

8. **DISHONORED CHECK FEE**: If Renter pays rent by check and such check is dishonored for any reason by the bank on which the check is drawn, Renter will be responsible to pay Owner a dishonored check fee of **$25.00**, in addition to the fee for late payment. This fee is added rent.

9. **SECURITY**: Renter has given a security deposit to Owner at the time of Renter's signing of this lease in the sum of **$1650.00**,

which is equal to one month's rent. If required by law, the account will bear interest at the banking institution's prevailing rate. If Renter carries out all of Renter's obligations under the terms of this lease, an annual payment of accrued interest will be made by the banking institution to the Renter, less 1% interest of the security on deposit, to be tendered by the banking institution to Owner. Owner may use or apply all or any part of the deposit as may be required to pay for damage to the apartment during the term of his lease. If Renter carries out all of Renter's obligations under this lease, and if the apartment is returned to Owner at the expiration of the lease term in the same condition as when rented by Renter, ordinary wear and tear excepted, Renter's security deposit will be returned in full to Renter, with accrued interest thereon, within 30 days of Renter vacating. If this lease is renewed, and the amount of security deposit Owner is permitted to retain is increased above the amount deposited upon the commencement of this lease term then Renter shall, upon such lease renewal, pay to the order of Owner such additional sum. If Owner sells or leases the building, Owner may remit the security deposit, as provided by law, to Renter or to the new Owner or lessee, at Owner's election. If Owner remits the security deposit to the new Owner or lessee, Renter agrees to seek the return of the security deposit from the new Owner or lessee, and releases Owner from any claim to the security deposit. Renter shall not use the security on deposit to pay the last month's rent of the lease term. Owner may use security deposit in full or in part if necessary to pay for unpaid rent, damage, loss, fees or expenses due to re-renting arising out of the lease or breach thereof.

10. **SUBLETTING/ASSIGNEMENT**: Renter shall not assign the apartment in whole or in part nor sublet the apartment in whole or in part without the written consent of Owner, nor permit anyone not specifically indicated in this lease to occupy the apartment. A sublet without consent or any assignment shall constitute a breach of a substantial obligation of this lease.

Initials **No Roommate:** Allowed other than required by law.

11. **SERVICES**: The following services and utilities are the responsibility of:
Owner:
        Other xxxxxxxxxxxxxxxxxxxxxxxxxxx
Renter:
        Other xxxxxxxxxxxxxxxxxxxxxxxxxxx

12. **OWNER'S INABILITY TO PROVIDE SERVICE**: If Owner is unable to provide certain services as a result of circumstances which are not the fault of Owner, Renter's obligations under this lease, including the obligation to pay rent without abatement, shall remain in effect.

13. **REPAIRS**: Renter is responsible for the proper maintenance of the apartment. Renter must, at its sole cost and expense, repair or replace anything in the apartment requiring repair or replacement as a result of Renter's actions or neglect. If Renter fails to effectuate such repair or replacement Owner may do so at the Renter's expense. The cost of such repair or replacement shall be added rent. Renter will reimburse Owner all costs and expenses incurred by Owner to remedy damages to the apartment or the building caused by Renter, members of Renter's family, Renter's guests or Renter's household staff. Such sums shall be added rent.

14. **ACCESS**: Owner shall be permitted to enter the apartment at all reasonable hours for the purposes of making repairs, showing the apartment to prospective renters, mortgagees, or buyers, making improvements to the building at Owner's sole discretion, and for the inspection of the apartment. In the event

of an emergency which affects the safety of the renters in the building or which may cause damage to the building, Owner may enter the premises without prior notice to Renter. Failure to provide access is a breach of a substantial obligation of this lease.

15. **LIABILITY OF RENTER**: Renter shall pay all sums incurred by Owner in the event Owner is held liable for damages resulting from any act by Renter.

16. **FIRE AND CASUALTY DAMAGE**: Renter is required to advise Owner immediately in the event of fire or other casualty which renders the apartment partially or wholly unfit for occupancy. Owner shall repair the premises as soon as possible subject to any delays due to adjustment of insurance claims or any cause not under Owner's control. If parts of the premises are usable, Renter must pay rent for the usable part. If the premises are damaged and Owner determines that the apartment is beyond repair, the term of this lease shall end and Renter must vacate the apartment. If the fire or casualty was caused by renter's actions, the cost of the repairs shall be repaid to Owner by Renter as added rent.

17. **RENTER DEFAULT:** In the event Renter does not comply with any obligation of this lease, creates a nuisance, engages in conduct detrimental to the safety of other renters, intentionally damages the property, or is disturbing to other renters, then Owner may terminate the tenancy and lease upon ten days written notice to Renter. Notwithstanding the foregoing, Owner shall not be required to give preliminary notice to Renter prior to initiating a non-payment summary proceeding except such notice as may be required by law. Any demand for rent may be made orally or in writing at the option of Owner.

18. **EARLY TERMINATION OF LEASE**: If this lease is canceled as set forth in paragraph "17," Renter must pay "use and occupancy" until Renter vacates the apartment. If Renter vacates the apartment prior to the expiration of the lease term, Renter shall be liable for "use and occupancy" until the expiration of the lease term or until such time as the apartment is re-rented, whichever is sooner. After Renter vacates, Owner may re-rent the apartment for the remainder of the lease term, or for a period shorter than or greater that the term of this lease at a monthly rental which may be more or less than the monthly rental specified on page one of this lease. If the apartment is re-rented for less that the monthly rental specified above, Renter shall be liable for the difference between Renter's monthly rent and the new rental amount, until such time as the balance of the term of this lease expires. In addition, Renter shall be liable for all expenses incurred in connection with the re-renting of the apartment, including but not limited to broker's fees, advertising costs and cleaning expenses.

19. **LEGAL FEES** (Owner's Option):
☐ ~~In the event either Owner or Renter incurs legal fees and/or court costs in the enforcement of any of Owner's or Renter's rights under this lease or pursuant to law, neither party shall be entitled to the repayment of such legal fees and/or court costs.~~

If the above box is not checked, Renter shall be liable to Owner in the event Owner incurs legal fees in the enforcement of any of Owner's rights under this lease or pursuant to law. Renter shall be liable to Owner for such legal fees and/or court costs as added rent.

20. **NO JURY TRIAL**: In any legal proceeding arising under the terms of this lease, whether instituted by Owner or Renter, the parties agree to give up the right to a trial by jury. **The right to a trial by jury is an important right of Renter, and Renter is agreeing not to demand a trial by jury.** The foregoing is not

intended to prohibit a demand for a trial by jury in actions for personal injury or damage to property.

21. **NO COUNTERCLAIMS**: In any action by Owner seeking recovery of the apartment, Renter shall not make a counterclaim against Owner relating to any matter other than a claim that Owner has not properly maintained the condition of the building or apartment. Renter shall be required to bring an independent action on any other counterclaim.

22. **RE-ENTRY**: If Renter is dispossessed by legal action Owner may enter the apartment without being liable for reentry, and may re-rent the apartment. Renter will be liable to Owner for any and all expenses related to the entering, repairing, redecorating and re-renting. Renter waives the right to reenter the apartment after a final order or judgment in any action is signed or after Renter is removed from the leased apartment.

23. **WINDOW CLEANING**: Renter shall not allow any windows to be cleaned from the outside unless such service is provided by Owner.

24. **COMMON AREAS**: Renter shall not place baby carriages, bicycles or any other property in or on fire escapes, roofs, sidewalks, entrances, driveways, elevators, stairways, halls or any other public areas. Public access ways shall be used only for entering and leaving the apartment and the building. Only those elevators and passageways designated by Owner can be used for deliveries.

25. **GARBAGE AND REFUSE**: Garbage and recyclable items must be brought to the basement or other area designated by Owner in such a manner that Owner may direct. Carpets, rugs, or other articles shall not be hung or shaken out of any window of the building. Renter shall not sweep or throw or permit to be swept or thrown any dirt, garbage or other substances out of the windows or into any of the halls, elevators, elevator shafts or any other public areas. Renter shall not place any articles of refuse outside the apartment or outside the building except in safe container and only at places designated by Owner. Renter shall be liable to Owner for any violations issued to Owner as a result of Renter's failure to properly recycle or other violation of law.

26. **KEYS**: Renter must provide a key to any and all locks to Renter's apartment to Owner, and Owner must pay Renter the reasonable cost of the keys. Renter shall not install a double-keyed cylinder in any lock to Renter's apartment.

27. **NO PETS**: Renter acknowledges that he shall not have any dog, cat or other animal on the premises unless permitted in writing by Owner. Where Owner permits or waives his right to object to a pet belonging to Renter, Owner does not waive his right to deny or object to any other pet belonging to Renter or any other Renter. In no event shall any dog, cat or other animal be permitted in any elevator or in any public portion of the building unless carried or on a leash. Failure to comply with this provision shall be grounds for termination of the tenancy and lease.

28. **SMOKE AND CARBON MONOXIDE ALARMS**: Renter acknowledges that the apartment being rented has Smoke and Carbon Monoxide alarm(s) in proper working order, if required by law.

29. **WINDOW GUARDS**: Renter hereby agrees to notify Owner if any child who is ten years of age or under occupies Renter's apartment so that Owner may install window guards in each window of the apartment in accordance with law, which shall be at tenant's expense. Renter shall not install any gate or guard on any window without written permission of the Owner or remove any window guard installed by Owner. Renter shall be liable to

Owner for any violations issued to Owner as a result of Renter's failure to permit owner to install window guards or for installing any gate or guard on any window in violation of law.

30. **Air Conditioners.** Landlord is not required to provide, install nor maintain air-conditioner(s). Tenant may install air-conditioner(s) provided Tenant first advises Landlord in writing of the intention to install and of the location of the installation. Under no circumstances shall Tenant install an air- conditioner in any window or wall near, around or abutting the building's fire escapes. Any such installation by the Tenant must be made permanent, with one way screws and brackets, and will become the property of the Landlord should the Tenant vacate the premises. Tenant may request that the Landlord install a Tenant-supplied air-conditioner at a charge of $200.00 per installation, to be paid in advance of such installation. Tenant must not install or supply an air-conditioner that uses an electric load greater than what the existing wiring and feeders of the apartment and building can safely carry. A violation of this provision shall be deemed a material violation of this lease.

31. **PEELING PAINT**: Renter hereby agrees to notify Owner of fnitials _____ any paint within the apartment that is peeling, cracking, flaking, blistering or loose in any manner so that Owner may repair such conditions.

32. **FACILITIES**: Storeroom, roof access, laundry facilities in the building or television master antenna may be provided by Owner at the option of Owner. Owner may discontinue the facilities at any time and shall not be liable for any damage, injury or loss from the use or discontinuance of these facilities.

33. **ALTERATIONS/CARPETING/INSTALLATIONS**: At least 80% of the floor area of each room, except for kitchens and bathrooms, shall be covered with rugs or carpeting. Renter may not paste or nail any carpet, tile or linoleum to the floors. Renter shall not apply wallpaper or other wall covering to the walls or ceilings. When Renter vacates the apartment, it shall be left painted in the same color as when rented. Renter shall not install a waterbed, washing machine, dryer, dishwasher, air conditioner, refrigerator, sink, garbage disposal, kitchen cabinets, stove, other mechanical equipment or an external antenna in an apartment without the written consent of Owner or make any other changes, alterations or improvements. If Renter is permitted and does install a window air conditioner, dishwasher or washing machine, Owner is entitled to receive an increase in accordance with law. The rent increase is payable to Owner as added rent beginning on the first day of the month following installation.

34. **DEPOSIT OF RENT**: If Owner commences legal proceedings against Renter, Renter may be required to deposit rent into court. Failure to deposit such rent may result in the entry of a final judgment against Renter.

35. **MOLD AND MILDEW**: Renter acknowledges that renter must take measures to prevent mold and mildew from growing in the unit. Renter agrees to remove visible moisture accumulating from the windows, walls and other surfaces. Renter agrees not to cover or block any heating, ventilation or air conditioning (HVAC) ducts in the unit. Renter agrees to immediately notify Owner of (a) any water leaks or excessive moisture in the unit (b) any evidence of mold or mildew; (c) any failure of any HVAC systems in the unit; and any inoperable doors or windows. Renter agrees that Renter shall be responsible for any damage to the unit and Renter's property as well as personal injury to Renter and occupants resulting for Renter's failure to comply with this lease provision. Any breach of this lease

---

**Tenant Name:**     **Address:** 615 WARBURTON AVE, YONKERS NY 10701 **Apt. No.:**

provision shall be considered a breach of a material term of this lease.

36. **POOL AND RECREATION ARE**AS: Permission to use any pool and/or recreation areas, including playroom and health club, must be in writing. Owner may revoke permission at any time. Renter must pay all fees imposed by Owner.

37. **TERRACES AND BALCONIES**: The apartment may have a terrace or balcony. The terms of this lease apply to the terrace or balcony as if the terrace or balconies are part of the apartment. Owner may make special rules for the terrace and balcony. Owner will notify Renter of such rules. The failure of Renter to comply with such rules shall constitute a substantial violation of the lease. Renter must keep the terrace or balcony in good repair and clean and free from snow, ice, leaves and garbage. No cooking is allowed on the terrace or balcony. Renter may not keep plants or install a fence or any addition on the terrace or balcony or use such space for storage purposes. If Renter does so, Owner has the right to remove and store them at Renter's expense.

38. **BATHROOM AND PLUMBING FIXTURES**: The bathrooms, toilets wash closets and plumbing fixtures shall only be used for the purposes for which they were designed or build; sweeping, rubbish bags, acids or other substances shall not be placed in them.

39. **ELEVATORS**: All non-automatic passenger and service elevators shall be operated only by employees of Owner and must not in any event be interfered with by Renter. The service elevators, if any, shall be used by messengers and trades people for entering and leaving and the passenger elevator, if any, shall not be used by them for any purpose.

40. **LAUNDRY**: Laundry machines if any, provided by Owner shall be used by Renter in the manner and at the times that Owner may designate. Renter shall not dry or air clothes on the roof or on the terrace or balcony, if any. Renter may use laundry machines, if any, at her own risk.

41. **OBJECTIONABLE CONDUCT**: Renter, their families, guests, employees, or visitors shall not engage in any conduct which makes the apartment or building less fit to live in for Renter or other occupants. Renter shall not make or permit any disturbing noises in the apartment or building or permit anything to be done that will interfere with the rights, comfort or convenience of other renters. Renter shall not play a musical instrument or operate allow to be operated audio or video equipment so as to disturb or annoy any other occupant of the building.

42. **NO PROJECTIONS**: Renter may not install or cause to be installed anything on the roof or outside wall of the building or any balcony, terrace, or window, or common areas. Satellite dishes shall not be installed except in accordance with law.

43. **MOVING**: Renter can use the elevator or service elevator, if any, to move furniture and possessions only on designated days and at designated hours. Owner shall not be liable for any costs, expenses or damages incurred by Renter in moving because of delays caused by unavailability of the elevator. Renter shall be liable for any damage caused to the building or the apartment during such move.

44. **INSURANCE**:

**a. Renter's Apartment Insurance Required.** Renter must obtain and keep in full force and effect during the term of this Lease Homeowners 4 ("HO4") apartment insurance or the equivalent issued by a licensed insurance company qualified to do business in the State of New York with minimum limits of $_____for Personal Liability and Property Damage and

Contents coverage with the perils insured against in a HO4 policy or the equivalent, at 100% replacement cost. Renter must provide Owner with a copy of the Renter's policy and/or a certificate stating that the policy is in full force within 10 days of the signing of this Lease and upon request during the term of this Lease.

☐ **b. Renter's Flood Insurance Required.** The Renter must obtain and keep in full force during the term of this Lease a FEMA National Flood Insurance Program Dwelling Form Standard Flood Insurance Policy or the equivalent that shall cover flood-caused loss of, or damage to, all property in the Apartment with minimum limits of $_____. Renter must provide Owner with a copy of the Renter's policy or a certificate stating that the policy is in full force within 10 days of the signing of this Lease and upon request during the term of this Lease. If the box above is checked Renter is required to have flood insurance.

45. **ABANDONMENT**: The removal of all or a substantial part of Renter's furniture from the apartment or any other indications that the apartment has been vacated shall be deemed an abandonment by Renter and Owner may then reenter and take possession of the apartment, repair and redecorate it for the purpose of re-renting whether or not Renter has surrendered the keys. Such taking by Owner shall not be deemed to relieve a Renter from liability to pay the rent. Renter releases Owner from any and all claims for damages by reason of such re-entry.

46. **END OF TERM**: At the end of the lease term, Renter shall leave the apartment clean and in good order, reasonable wear and tear excepted, Renter shall remove all of Renter's personal possessions from the apartment after Renter has vacated. If any property remains in the apartment at the expiration of the term, it will be deemed by Owner to be abandoned property which owner may discard or sell. Renter agrees to pay any expenses incurred by Owner as a result of Owner's disposition of said property.

47. **WAIVER OF FOREIGN SOVEREIGN AND DILOMATIC IMMUNITY**: Renter represents that he is not subject to foreign sovereign or diplomatic immunity. Renter expressly waives the doctrine of foreign sovereign immunity and diplomatic immunity and consents to the jurisdiction of the Housing Court and all other courts. Renter expressly represents that in the event a judgment is obtained against him Owner may enforce the judgment against any property or assets of Renter, wherever they are located.

48. **MILITARY STATUS**:

☐ Renter represents that he is in the United States military, or is dependent upon a member of the United States military.

☐ Renter represents that he is *not* in the United States military, and is *not* dependent upon a member of the United States military. Renter shall notify Owner within ten days of enlistment in the military.

The above response is for informational purposes only and is intended to protect Renters who are in or may enter into military service.

49. **PARTIES BOUND**: This lease agreement is binding on Owner and Renter, and on all those who claim a right, or have a right, to succeed to the legal interest of Owner and Renter.

50. **FORMS**: Renter agrees to complete any and all forms that be requested by Owner from time to time.

51. **SUBORDINATION**: The rights of Renter, including all rights granted under the terms of this lease are, and shall be, subject to

---

**Tenant Name:** **Address:** 615 WARBURTON AVE, YONKERS NY 10701 **Apt. No.:**

and subordinate to the terms of any mortgage on the building or the land under the building which now exists, or which may hereafter exist. The foregoing shall include but not be limited to any modification, consolidation, or extension agreement of any existing mortgage on the land or building.

52. **SINGULAR/PLURAL and JOINT/SEVERAL**: The use of the singular shall be deemed to include the plural, and vice versa, whenever the context so requires. If more than one person is renting the apartment, their obligations shall be joint and several.

53. **CONDEMNATIOIN/EMINENT DOMAIN**: If the building or any part of the building is taken or condemned by a public authority or government agency, this lease will end on the date of such taking. In such event, Renter will have no claim for damages against Owner based upon such a taking, and Renter will be required to surrender the apartment to Owner upon 30 days written notice from Owner to Renter of such government taking.

54. **CONSTRUCTION/CONVENIENCE**: Neighboring buildings may be the subject of construction, renovation or demolition. Owner will not be liable to Renter, nor shall Renter seek to hold Owner liable for interference with views, light, airflow, or ventilation, the covenant of quiet enjoyment, or breach of the warranty of habitality whether such interference is temporary or permanent, if such interference results from activities conducted on adjoining Owners' properties.

54. **NO WAIVER**: The failure of Owner to insist at any time upon strict performance of any clause in this lease shall not be construed as a waiver of Owner's rights. No waiver by Owner of any provision of this lease can be made unless made in writing by Owner. Acceptance of rent by Owner with knowledge of the breach of any condition or term of this lease is not a waiver of the breach.

55. **CREDIT REPORTS**: Renter authorizes Owner to use the Social Security number of Renter to obtain any and all credit reports for the purpose of the initial lease or any renewal thereof now and no more than five years after the expiration of this lease or any renewal thereof, and fully understands that these reports will be used by owner in connection with Renter's occupancy of the apartment.

56. **GUARANTOR**: If Renter has a Guarantor sign the initial lease, Renter agrees to have a Guarantor sign all renewal leases. The guarantee is a material term and condition of the lease. The failure to continue the guarantee negates Owner's obligation to enter into a renewal lease. (Renter initial if applicable ).

57. **NO RIƧT TO RENEWAL**: Renter acknowledges that there is no right to a renewal lease. If Owner, in its sole discretion, determines that it will offer a renewal lease, Owner may set a new rent.

58. **NOTICES**: All notices, which include bills and/or other statements with respect to this lease, must be in writing. Notices to Renter shall be sent to Renter at the apartment by regular mail except that any notice alleging failure to comply with any terms of this lease shall be sent by certified mail. Notices to the Owner shall be sent to Owner by certified mail to the address on this lease, or to such other address as Owner shall advise Renter in writing. Notices will be considered delivered on the date mailed.

59. **THIS APARTMENT IS NOT SUBJECT TO RENT STABILIZATION**: It is expressly understood that the apartment which is the subject of this lease is not subject to the Rent Stabilization law or any other regulatory laws. The Owner is not obligated to offer Renter a renewal of this lease and may alter any or all terms or conditions of this lease in the event of a renewal.

60. **ENTIRE AGREEMENT**: Owner and Renter have read this lease and agree that it contains the entire understanding of the parties regarding the rental of the subject apartment. The lease can only be changed in writing. The writing must be signed by both Owner and Renter.

61. Tenant has the right to vacate at any time with 30 days notice.

**If any part of this lease is determined to be unlawful,
the remaining provisions of the lease will remain valid and in full force and effect.**

_____     X_____
**Owner/Agent** (*on behalf of Owner*)            **Renter**

                                            X_____
                                            **Renter**

| **Tenant Name:** | **Address:** 615 WARBURTON AVE, YONKERS NY 10701 **Apt. No.:** |

## DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS

*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose and dust can pose health hazards if not taken care of properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, Owners must disclose the presence of known lead-based paint and lead-based paint hazards in the dwelling. Renters must also receive a federally approved pamphlet on lead poisoning prevention.*

**Lessor's Disclosure** (initial)

**(a) Presence of lead-based paint or lead-based hazards (check one below):**
☐ Known lead –based paint and/or lead-based paint hazards are present in the housing (explain).

_____

_____

☒ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

**(b) Records and reports available to the lessor (check one below):**
☐ Lessor has provided the lessee with all available records and reports pertaining to lead based paint and/or lead-based paint hazards in the housing (list documents below).

_____

☒ Lessor has no reports or records pertaining to lead-based paint and/or lead-based hazards in the housing.

**(c) Lessee's Acknowledgment** (initial)
☐ Lessee has received copies of all information listed above.
☐ Lessee has received the pamphlet *Protect Your Family from Lead in Your Home*.

**(d) Agent's Acknowledgment** (initial)
☐ Agent has informed the lessee of the lessor's obligations under 42 U.S.C. 4852d, and is aware of his/her responsibility to ensure compliance.

### Certification of Accuracy

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

X

_____     _____          _____     _____

**Lessee/Renter**            **Date**        **Agent/Owner**             **Date**

---

**Tenant Name:** BRADLEY KATZ **Address:** 615 WARBURTON AVE, YONKERS NY 10701 **Apt. No.:** 2A

State of New York
**Division of Housing and Community Renewal**
Office of Rent Administration
Web Site: www.nysdhcr.gov

---

**NOTICE TO TENANT**
**DISCLOSURE OF BEDBUG INFESTATION HISTORY**

---

Pursuant to the NYC Housing Maintenance Code, an owner/managing agent of residential rental property shall furnish to each tenant signing a vacancy lease a notice that sets forth the property's bedbug infestation history.

Name of tenant(s):

Subject Premises: 615 WARBURTON AVE, YONKERS NY 10701

Apt. #:

Date of vacancy lease:

**BEDBUG INFESTATION HISTORY**
(Only boxes checked apply)

[ ] There is no history of any bedbug infestation within the past year in the building or in any apartment.

[ ] During the past year the building had a bedbug infestation history that has been the subject of eradication measures. The location of the infestation was on the _____ floor(s).

[ ] During the past year the building had a bedbug infestation history on the _____ floor(s) and it has not been the subject of eradication measures.

[ ] During the past year the apartment had a bedbug infestation history and eradication measures were employed.

[ ] During the past year the apartment had a bedbug infestation history and eradication measures were not employed.

[ ] Other: _____

Signature of Tenant(s):_____Dated: Signature of Owner/Managing Agent:___
_____Dated: