UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:

                              Chapter 11 (SubChapter V)

BUCKINGHAM TOWER CONDOMINIUM, INC.
f/k/a BUCKINGHAM OWNERS, INC.,

                              Case No. 22-22403-shl

                    Debtor.
-----------------------------------------------------------------X

## SMALL BUSINESS SUB-CHAPTER V PLAN OF LIQUIDATION AS AMENDED

## ARTICLE I
## DEFINITIONS

Unless the context requires, the following capitalized terms shall have the following meanings ascribed to them in this Plan.  Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to it therein. Where the context requires, any definition applies to the plural as well as the singular number.

1.1     **"Administrative Claim"** means a claim for, or request for payment of, an Administrative Expense (i) as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, and (ii) as to which any objection has been resolved by a Final Order to the extent such objection has been resolved in favor of the holder of such claim.

1.2     **"Administrative Expense"** means any cost or expense of administration of this case, other than Bankruptcy Fees, allowable under sections 503(b) or 330 of the Bankruptcy Code.

1.3     **"Allowed"** means a claim against or interest in the Debtor that has not been disallowed pursuant to a Final Order and is not a disputed claim and (i) with respect

1

to which a Proof of Claim has been timely filed with the Clerk of the Bankruptcy Court or, (ii) if no Proof of Claim has been filed, that has been or hereafter is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent.

1.4 **"Apartment"** means one of the individual apartment Units which comprise the Debtor.

1.5 **"Aria"** means Aria Capital LLC.

1.6 **"Auction Sale"** means the public auction of the Units conducted by Maltz on March 29, 2023 pursuant to the order entered on March 8, 2023 as Dkt. No. 90.

1.7 "**Bankruptcy Court**" means the bankruptcy court presiding over the Debtor's Chapter 11 case.

1.8 "**Bar Date**" means any date set by Order of the Bankruptcy Court subsequent to which a Proof of Claim or Proof of Interest is not timely filed.

1.9 "**Bid Procedures Order**" means the Order entered by this Court dated March 8, 2023 (Dkt. No. 90) which governs the conduct of the sale of the Units at the Auction Sale.

1.10 **"Building"** is the premises located at 615 Warburton Avenue, Yonkers, NY 10701.

1.11 "**Claim**" means a claim as defined in section 101 (5) of the Bankruptcy Code.

1.12 "**Class**" means a category of substantially similar Allowed Claims as established pursuant to the Plan.

1.13 **"Closing"** shall the mean the consummation of the sale of the Apartments pursuant to the successful bidders at the Auction Sale.

1.14    "**Confirmation**" means the entry of the Confirmation Order.

1.15    "**Confirmation Date**" means the date on which the Confirmation Order is entered by the Bankruptcy Court and becomes a Final Order.

1.16    "**Confirmation Order**" means an Order confirming the Plan pursuant to Section 1129 of the Bankruptcy Code in form and substance reasonably satisfactory to the Debtor.

1.17    "**Condo Association**" means the Buckingham Tower Condominium Association which maintains the Building and filed claim numbered 4.

1.18    "**COVID**" means the COVID-19 global pandemic.

1.19    "**DCG**" means Dwight City Group and/or any affiliates or related entities.

1.20    "**Debtor**" means Buckingham Tower Condominium, Inc. f/k/a Buckingham Owners, Inc.

1.21    "**Delinquent Shareholders**" means the Shareholders who have not paid maintenance charges or otherwise are indebted to the Debtor.

1.22    "**Disbursing Agent**" means any entity designated in the Confirmation Order to make distribution in accordance with the terms of the Plan.

1.23    "**Distribution**" means a disbursement made under the Plan.

1.24    "**Effective Date**" means the later of (i) the seventh day after the Confirmation Date and the other conditions to the Effective Date set forth herein have occurred; or (ii) the seventh day after the Closing.

1.25    "**Estate**" means the estate created on the Petition Date pursuant to section 541 of the Bankruptcy Code.

1.26    "**Executory Contract**" means an executory contract within the meaning

of section 365 of the Bankruptcy Code and includes leases to which the Debtor is a party.

1.27 **"Final Order"** means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal located in one of the states, territories or possessions of the United States or the District of Columbia, that has not been stayed or that is no longer subject to appeal, *certiorari* proceeding or other proceeding for review or rehearing, and as to which no appeal, *certiorari* proceeding, or other proceeding for review or rehearing shall then be pending.

1.28 **"Guerrero"** means Jose Guerrero, who chairs the Debtor's Board of Directors and is the principal of 615 Warburton.

1.29 **"Interest"** means an equity interest in the Debtor.

1.30 **"IRS"** means the Internal Revenue Service.

1.31 **"Lenders"** collectively mean entities who hold a lien on the stock interests of any Shareholder.

1.32 **"Maintenance"** is the amount due from each Shareholder to the Debtor inclusive of any fees and charges assessed.

1.33 **"Maltz"** means Maltz Auctions, Inc. and/or Richard Maltz.

1.34 **"NYS"** means New York State Department of Taxation and Finance.

1.35 **"Petition Date"** means June 30, 2022, the date on which this case was commenced by the filing of a voluntary petition for relief under Sub-Chapter V of Chapter 11 of the Bankruptcy Code by the Debtor.

1.36 **"Plan Administrator"** means the individual or entity with powers to consummate the Plan and carry out certain actions thereunder.

1.37 **"Plan Fund"** shall mean a fund established from the net proceeds of the

sale after payment of ordinary and necessary closing costs, and the satisfaction of Titan and Yonkers.

1.38    **Priority Claim"** means a claim entitled to Priority under section 507(a) of the Bankruptcy Code with the exception of Administrative Claims.

1.39    **Professional"** means all professionals employed by the Debtor under section 327 of the Bankruptcy Code pursuant to a Final Order.

1.40    "**Professional Fees**" means compensation for services rendered, and reimbursement of expenses incurred, by Professionals, as awarded by Final Order following application, in accordance with section 330 of the Bankruptcy Code.

1.41    "**Proof of Claim**" means a proof of Claim filed pursuant to section 501 of the Bankruptcy Code and Part III of the Bankruptcy Rules.

1.42    "**Property**" means the assets of the Debtor, as listed on Schedules A/B of the Petition, or otherwise noted in this Plan.

1.43    "**Proprietary Lease**" means any agreement between a Shareholder and the Debtor or predecessor in interest governing occupancy of a Unit.

1.44    "**Pro Rata**" means the proportion an Allowed Claim in a particular Class bears to the aggregate amount of all Allowed Claims in such Class.

1.45    "**Sale"** means the sale of the Units to the Successful Bidders pursuant to the terms of the Auction Sale.

1.46    "**Schedules**" mean the schedules of assets and liabilities and the filed by the Debtor with the Bankruptcy Court in accordance with section 521(1) of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules and any amendments thereto.

1.47    "**Shareholder**" means any individual holder of equity security interests in the Debtor.

1.48    **"Successful Bidders"** means, collectively, the individuals and entities that made the highest and best bids for the Units.

1.49    **"TB Holdings Yonkers"** means TB Holdings.

1.50    "**Titan**" means Titan Capital ID, LLC.

1.51    "**Trustee**" or "**SubChapter V Trustee**" is and refers to the Sub-Chapter V Trustee, Heidi J. Sorvino.

1.52    "**Unsecured Claim**" means a Claim, that is not an Administrative Claim or a Priority Claim.

1.53    "**Unexpired Lease**" means an unexpired lease within the meaning of Section 365 of the Bankruptcy Code.

1.54    **"Units"** mean the individual apartment units which comprise the Building.

1.55    **"Warburton 3"** means Warburton 3, LLC

1.56    **"Yonkers"** means the City of Yonkers.

1.57    **"615 Warburton"** means 615 Warburton Holding Group, the holder of claim numbered 5.

## ARTICLE II
## <u>BACKGROUND</u>

On June 30, 2022, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor was formerly a cooperative corporation which converted to a condominium pursuant to a condominium offering plan dated September 16, 2014 as thereafter amended and restated.  It is in the business of owning and managing twenty-five (25) Apartments, twenty -four (24) of which are occupied by individual Shareholders and their families; an additional unit is occupied by the Building's

superintendent. The Apartments are located in the Building.  The Building is managed by the Condo Association to which the Debtor pays monthly common charges. The Condo Association maintains the Building and provides for insurance coverage.

The Debtor's financial predicament began in or about 2008. The sponsor of the cooperative association obtained a mortgage in 1999 from National Consumer Cooperative Bank, as assignee of NCB Capital Corporation, which consolidated prior mortgage loans on the property. Despite collecting common charges from the Shareholders, the sponsor neglected to make payments. The mortgage holder commenced a foreclosure action and a judgment of foreclosure was entered.  The sponsor was ultimately ousted from control.

In an effort to save the Building from foreclosure, a loan was secured from Titan whereby Titan would acquire the NCB mortgage loan and related foreclosure judgment by assignment.  According to Titan, its role was initially to serve as a "bridge lender" to provide interim financing.  However, when the Titan loan was not paid off in accordance with its term, this role was extended and Titan essentially became a "long term" lender through a series of forbearance agreements.

As part of the loan agreement with Titan, the sponsor was obligated to continue with its previously commenced effort to convert the Building from a cooperative to a condominium. This plan was intended to alleviate the financial problems of the Debtor and satisfy its outstanding debt. The plan was effectuated on or about August 31, 2009 by the filing of the Declaration of Condominium with the Office of the Westchester County Clerk. The intention was that with each condominium unit ("Unit(s)") sold, a payment would be made to Titan in exchange for a release of its lien against that Unit. Since 2018, approximately sixty-five (65) Units in the Building have been sold and Titan has released

its lien against each in exchange for a pay down on the outstanding loan

Titan asserts that approximately $3,100,000.00 remained due and owing as of March 29, 2023. Titan filed proof of claim numbered 6 which asserted that the sum of $2,961,035 was due and owing as of the Petition Date. Titan holds a note, mortgage, assignment of leases and rents and a foreclosure judgment lien. Until such time as the amounts due Titan are satisfied, interest and attorneys' fees due Titan continue to accrue.

Since the filing, the Debtor has continued in the management of its property as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

No official committee of unsecured creditors or other statutory committee and no examiner has been appointed in this case. Heidi J. Sorvino serves as the SubChapter V Trustee.

The Debtor's goal from the outset of this case has been to formulate a plan that satisfies Titan and other creditors but also (i) permits the Shareholders, many of whom are elderly, to continue to reside in the Building if they wish to; (ii) affords Shareholders the opportunity to acquire their Apartments; and (iii) offers fair value to those who wish to leave.

Pre-petition, the Debtor was exploring funding a plan through: (i) the sale of some of the Units in a block; (ii) common charges generated; and/or (iii) refinancing, or a combination thereof. DCG, which owns other Units in the Building, had expressed an interest in acquiring the Apartments pre-petition. Post-Petition, DCG made an initial offer to purchase the Apartments. As discussed more fully below, the basic terms of DCG's offer were presented to Shareholders, many of whom provided comments. The terms were thereafter negotiated and finalized. They were presented to the Shareholders with options for moving forward. A plan predicated upon the sale to DCG was proposed. However,

DCG withdrew its offer following the precipitous rise in prevailing interest rates. Thereafter, as discussed more fully below, an Auction Sale was conducted and the Debtor contemplates a sale to the Successful Bidders free and clear of all liens, Claims and encumbrances pursuant to 11 U.S.C. § 363.

## Significant Aspects of the Bankruptcy

Following the Debtor's Chapter 11 filing, the Debtor and Titan reached an agreement for the use of Cash Collateral on an interim basis. The Debtor has complied with its obligations under the terms of such agreement. An Order approving the use of Cash Collateral on an interim basis was entered on August 19, 2022 (Dkt. No. 32). The Debtor moved for approval of an interim waiver of the requirement that it establish a DIP checking account. An Interim Order approving the use of its pre-petition bank account was entered on August 15, 2022 (Dkt. No. 31). A Second Interim Order was entered on September 22, 2022 (Dkt. No. 54).   Since that time, the Debtor has been making "adequate protection" payments to Titan in the amount of $12,000.00 per month.

The Debtor retained Penachio Malara, LLP as its counsel. An Order authorizing same was entered on September 12, 2022 (Dkt. No. 42). Applications to retain an account (Dkt. No. 24) and special counsel (Dkt. No. 40) are pending. The Debtor is current with operating reports having filed through March 2023.

## The Shareholders

The Apartments consist of one Unit occupied by the Building's superintendent and 24 Units occupied by Shareholders.   The Shareholders, many of whom have resided in the Building for decades, were provided with information about this proceeding and various options as to an exit plan.   A list of Shareholders is annexed hereto as Exhibit A.

The Shareholders were invited to attend an informational meeting by Zoom which was conducted on August 24, 2022. Approximately 18 Shareholders were in attendance. Several appeared with counsel. All Shareholders were afforded an opportunity to express their views and any questions posed were addressed by counsel and Guerrero. Many Shareholders expressed disappointment and frustration that Titan had not been satisfied. However, as Guerrero explained, it was difficult to raise common charges and impose assessments on Shareholders, many of whom are elderly and receive a "fixed income," particularly during COVID.

Following the ZOOM meeting, based on the overall sentiment of Shareholders, Guerrero and counsel contacted DCG to discuss a purchase of the Apartments. DCG and the Debtor engaged in extensive negotiations. Ultimately, DCG extended an offer to purchase the Apartments which provided each Shareholder with the choice of (i) selling but remining in the Apartment as a tenant with a lease and a re-purchase option or (ii) selling and vacating. The consideration offered by DCG exceeded its initial offer significantly. Unfortunately, DCG withdrew its offer.

Thereafter, the Shareholders were invited to a second meeting via ZOOM. The second meeting was conducted in a "Town Hall" style format. The SubChapter V Trustee, representatives of Titan, Titan's counsel and Guerrero were among those present. The parameters of a plan were discussed. Shareholders were informed, in sum and substance, that they could bid on any Apartment including the Apartment in which they resided. Counsel has continued to respond to any questions posed by any of the Shareholders.

## The Debtor's Assets and Operations

The Debtor's assets consist primarily of the twenty-four (24) Apartments. They are worth approximately $3.7 million. The Debtor has limited "cash on hand" in the

amount of $22,000.00 as reflected in the last monthly operating report.  It is owed funds by the Delinquent Shareholders.  A liquidation analysis is annexed hereto as Exhibit B.

**Claims**

The Claims bar date for non-governmental entities was September 16, 2022.  Nine (9) proofs of Claim were filed.  Copies of a claims analysis and the official claims register are together annexed hereto as Exhibit C.  Buckingham Tower is the Condo Association which is owed back maintenance. 615 Warburton is a prior owner of at least one Apartment.  TB Yonkers is an entity affiliated with Aria Capital.  It was the sponsor of the condominium offering plan. Both 615 Warburton and TB Yonkers are Insiders.

**Liquidation Analysis**

To confirm the Plan, the Bankruptcy Court must find that all holders of Allowed Claims will receive at least as much under the Plan as they would receive in a Chapter 7 liquidation. The Debtor's Schedules on file with the Bankruptcy Court list the Debtor's Property, which would be subject to liquidation in a Chapter 7. The Debtor's assets include Apartments.

Under the Plan, creditors and Shareholders will receive more than they would receive in a Chapter 7 liquidation.  As demonstrated on Exhibit B, recovery would be diluted by sales commissions, other costs of sale and a Chapter 7 trustee's commission. Distribution to unsecured creditors would be delayed due to the administrative requirements of a Chapter 7. During such delays, the amount due to Titan and the City of Yonkers would increase as a result of the accrual of interest and costs. Ultimately, the recovery to unsecured creditors would be reduced which would in turn reduce any recovery to Shareholders, to the extent that funds even remained to be distributed to Shareholders.  Moreover, the sale of the assets through a Chapter 11 Plan will exempt

the Debtor from transfer taxes imposed by New York State and the City of Yonkers. The Debtor estimates such taxes to total approximately $70,000.00.   Finally, in the event of a sale under Chapter 7, Shareholders would likely not be afforded an opportunity of a lease or "key money."

## The Plan

(a)  Introduction

The Debtor explored various alternatives to the Plan including (i) re-negotiating a long-term payout with Titan; (ii) refinancing the obligation to Titan; (iii) auction of the Apartments and (iv) private sale of the Apartments. Titan was unwilling to engage in any further forbearance, explaining that it had already engaged in forbearance for more than 10 years.  Efforts to refinance were futile.  As such, a sale by auction became the only viable alternative.

After exploring alternatives, the Debtor presented various options to the Shareholders and considered their preferences.  DCG, which owns other Units in the Building, was willing to enter into an agreement consistent with the Shareholder's preferences.

## The Stalking Horse Contracts

In connection with the Auction Sale, after a series of negotiations, the Debtor entered into two "stalking horse" contracts, one with Warburton 3 an affiliate of DCG (the "Warburton 3 Contract") and the other with Aria (the "Aria Contract").

## The Warburton 3 Contract

Pursuant to the Warburton 3 contract, the Apartments to be transferred

consist of: 7F; 2E/F; 3K; 4D; 4J; 6N; 7C; 7D; 6G; 2H; 3C; 3E; 4E; 4L; 6D; 6H; 6J; 3B; and 5H. Each of the Apartments is ascribed a value which is relative to its size as set forth in the Warburton Contract. The total consideration to be paid to the Debtor is $2,885,600.00. The "average" price per unit is approximately $151,000.00. In addition, under the Warburton 3 Contract, Warburton 3 will remit the sum of $5,000.00 directly to each Shareholder vacating the Units. This additional sum is offered to provide relocation funds to the Shareholder occupants. In the alternative, Warburton 3 will offer each unit holder the opportunity to enter into a lease for the unit in a standard form pursuant to market rates. A copy of the form of the lease was annexed to the Warburton 3 Contract which was filed with the Court.

### The Aria Contract

Pursuant the Aria Contract, the units to be transferred consist of 1L; 7L; 7K; and 5K. Each of the units is ascribed a value which is relative to its size as set forth in the Aria Contract. The total consideration to be paid to the Debtor is $609,290.00. The average price per unit is $152,000.00. Pursuant to the Aria Contract, each of the unit holders would be offered a lease which will would allow them to remain in the unit. The form of the lease is annexed to the Aria Contract. The leases contain a "buy back" option which will permit each unit holder to re-purchase the unit which they occupy.

### The Bid Procedures Order

On March 8, 2023, this Court entered the Bid Procedures Order which, among other things, fixed procedures for the Auction Sale. The Auction Sale was conducted on March 29, 2023 by Maltz. Following the Auction Sale, Maltz prepared a

Report of Sale.  In accordance with the Bid Procedures Order, the Report of Sale was filed with the Court as Dkt. No. 98.

**The Auction Sale Results**

The results of the Auction Sale are set forth in the Report of Sale.  A summary is set forth below:

| Successful Bidder | Apartment | Price |
|---|---|---|
| Gabriella Bracaglia | 1L | $192,000.00 |
| Aria | 5L | $206,000.00 |
| Jacqueline Brown | 7F | $148,000.00 |
| Warburton 3 | 2/E and F; 2H, 3B, 3C, 3E, 3K, 4D, 4E, 4J, 4L, 5H, 6D, 6G, 6H, 6J, 6N, 7C, 7D, 5K, 7K and 7L | $3,216,960.00 |
| TOTAL: | | $3,762,960.00 |

The Debtor anticipates consummating the Closing on the sales to the successful bidder following the Effective Date. The Apartments will be conveyed free and clear of all liens, Claims and encumbrances pursuant to 11 U.S.C. § 363.

(b)   Funding

The Debtor will fund the Plan with the proceeds of the Auction Sale and any Cash on hand.   Payment to Titan and Yonkers for outstanding taxes due will be made at Closing.  The net proceeds of sale (after the payment of ordinary, customary and

reasonable closing costs, Titan and Yonkers), shall be placed in the Plan Fund.   Payment to creditors in Classes 3 and 4 and any Distributions to Shareholders will be made after the Closing from the Plan Fund.

    (b) <u>Projected Recovery of Avoidable Transfers</u>

        The Debtor is not aware of preference, fraudulent conveyance or any other avoidable transfers to be pursued.  Notwithstanding, the Plan Administrator is provided with powers hereunder to investigate and pursue avoidable transfers.

**ARTICLE III**
**<u>DESIGNATION OF CLAIMS AND INTERESTS</u>**

        All Claims and Interests, of whatever nature, whether or not scheduled or liquidated, absolute or contingent, whether resulting in an Allowed Claim or not, shall be bound by the provisions of the Plan and are hereby classified as follows:

    **Class 1** shall consist of the Debtor's liability to Titan.

    **Class 2** shall consist of amounts due to Yonkers for real property taxes.

    **Class 3--**shall consist of all Allowed Priority Claims.  The IRS filed a claim against the Debtor in the amount of $21,581.65 of which $16,252.11 is entitled to priority. NYS filed an amended claim against the Debtor in the amount of $32,050.36 of which $23,319.75 is asserted to be a priority.  It is for estimated taxes due for the period form 2015 to present.  Finally, the New York State Department of Labor filed a priority claim in the amount of $12.65.

    **Class 4 –** shall consist of the TB Yonkers.

    **Class 5 -** shall consist of all other Unsecured Claims.

    **Class 6 -**shall consist of the Shareholders.

    In accordance with section 1123 (a)(1) of the Bankruptcy Code,

Administrative Claims have not been classified.

**ARTICLE IV**
**TREATMENT OF CLAIMS UNDER THE PLAN**

1       **Satisfaction of Claims.** The treatment of and consideration to be received by holders of Allowed Claims shall be in full satisfaction, release and discharge of their respective claims against the Debtor.

**2.      Allowed Administrative Claims**

**(A)**(i) Administrative expenses incurred by the Debtor in the ordinary course of business following the Petition Date are expected to be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade creditors. Any other Allowed Administrative Claims, with the exception of Administrative Claims of Professionals *(including* the SubChapter V Trustee) shall be paid in full in cash from the Plan Fund on or before one business day after the Effective Date, or upon such other terms as agreed upon by the Debtor and the holder of such Claim.

(ii)     Allowed Administrative Claims of Professionals shall be paid in full in cash one business day after allowance by the Bankruptcy Court pursuant to section 330 of the Bankruptcy Code, or upon such other terms as agreed upon by the Debtor and the Professional.

The Debtor shall pay Allowed Administrative Claims at the Closing or from the Plan Fund or in accordance with any Order of the Court.

Allowed Administrative Claims are estimated to total approximately $175,000.00.

**3.      Class 1 – Titan**

Titan shall be paid in full in Cash from the proceeds of the sale of the Apartments at the time of the Closing.   Any disputed portion of Titan's claim shall be

held in escrow pending resolution of such amount consistent with Article VI hereof.

Titan is unimpaired under the Plan and therefore not entitled to vote to accept or reject the Plan.

4. **Class 2 – Yonkers**

Yonkers shall be paid in full in Cash from the proceeds of the sale of the Apartments at the time of the Closing or within 5 days thereof. Any disputed portion of Yonkers' claim shall be held in escrow pending resolution of such amount consistent with Article VI hereof.

Yonkers is unimpaired under the Plan and therefore not entitled to vote to accept or reject the Plan.

5. **Class 3 – Priority Claims**

Allowed Priority Claims shall be paid in full in Cash from the proceeds of the sale of the Apartments within ten (10) business days after the Effective Date. Any disputed portion of any Priority Claim shall be held in escrow pending resolution of such amount consistent with Article VI hereof. Holders of Priority claims shall be entitled to post-petition interest on amounts due in accordance with any applicable law.

Class 3 Claims are unimpaired under the Plan and therefore not entitled to vote to accept or reject the Plan.

6. **Class 4 – TB Yonkers**

The Debtor and the SubChapter V Trustee dispute the Amended Claim of TB Yonkers. In the event that a resolution is not achieved, a formal objection will be made. The Amended Claim of TB Yonkers shall be treated solely as an unsecured Claim under 11 U.S.C. § 506 and estimated at "zero" for purposes of Distribution under this Plan.

The Class 4 Claim of TB Yonkers is unimpaired under the Plan and therefore not entitled to vote to accept or reject the Plan.

     7.      **Class 5 - General Unsecured Claims**

Allowed General Unsecured Claims shall either be paid in full in Cash or reserved for in full within ten (10) business days after the Effective Date. 615 Warburton and TB Yonkers shall be treated as each holding an Unsecured Claim. Holders of Class 5 General Unsecured Claims shall not be entitled to post-petition interest on amounts due. Any disputed portion of any General Unsecured Claim shall be held in escrow pending resolution of such amount consistent with Article VI hereof.

Class 5 Claims are impaired under the Plan and therefore entitled to vote to accept or reject the Plan.

     8.      **Class 6 – Interests of the Shareholders**

The Shareholders shall be paid their proportionate share of the remaining balance after all creditors including holders of Administrative Claims, Titan, Yonkers, holders of Priority Claims, and holders of General Unsecured Claims are satisfied. In order to receive a distribution, the Shareholders shall produce and surrender their respective stock certificates. Shareholders may also be required to complete a form under penalties of perjury regarding their interests and whether any encumbrances exist on their shares. Shareholders may also be required to provide their social security numbers and/or tax identification numbers.

If a Shareholder is unable to produce stock certificates, the Debtor and/or Plan Administrator may undertake judgment and Lien search with respect to such Shareholder. The cost of any such search shall be deducted from the amount, if any,

to which the Shareholder would be entitled.

The amount due to each Shareholder shall be determined with reference to the price paid by the Successful Bidder for such Shareholder's Apartment. Any amounts due to any Shareholder under this Plan shall be reduced by amounts that the Shareholder owes to the Debtor (ie unpaid Maintenance, related charges, and/or real property taxes) plus the costs of any judgment and Lien search and any other fees and costs that the Debtor, Reorganized Debtor and/or Plan Administrator may be required to expend. Any and all amounts due from a Delinquent Shareholder shall be deducted from the amounts that such Shareholder may be entitled to hereunder.

Within 120 days of the consummation of the sale of the Apartment, each Lender and Shareholder shall be provided by the Debtor with a proposed distribution schedule which shall also be filed with the Court. All interested parties will be afforded a reasonable opportunity to object to same. This 120 day period may be extended by the Court for cause shown.

In the event that a Lender holds a right to a Shareholder's Distribution or a portion thereof pursuant to any agreement between that Lender and a Shareholder, the Distribution to which such Shareholder would be entitled, shall be paid to the Lender. In the event that a dispute arises in connection with the Distribution to any Shareholder, the Court, in its discretion, may direct the Plan Administrator to investigate and report to the Court with compensation to be paid upon application to the Court.

The Shareholders' interests shall be extinguished contemporaneously with receipt of a Distribution hereunder.

Class 6 interests are unimpaired under the Plan and are deemed to have accepted the Plan.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
**Assumption and Assignment of Executory Contracts and Unexpired Leases.**

a.   On the Effective Date, any Executory Contracts and Unexpired Leases to which Debtor is a party shall be deemed rejected in accordance with section 365 of the Bankruptcy Code.  The Debtor is not aware of any executory contracts or leases other than Proprietary Leases with Shareholders.  All Proprietary Leases shall be rejected and deemed cancelled as to the Debtor on the Confirmation Date.

b.        **Rejection Claims.** Allowed Claims arising from the rejection of any Executory Contract or Unexpired Lease of the Debtor (other than the Proprietary Leases) pursuant to the Plan shall be treated as General Unsecured Claims.  The Shareholders (or any other party in interest) shall not be entitled to damages arising from the rejection of a Proprietary Leases from the Debtor.  Rather, the rights of any Shareholders shall be determined under applicable law and/or any offering plan and/or declaration filed with the Attorney General of the State of New York.

c.        **Bar Date for Rejection Claims.** A Proof of Claim with respect to any Unsecured Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease other than a Proprietary Lease pursuant to the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtor's counsel within 30 days after the later of (i) the date of notice of the entry of a Final Order approving such rejection (unless such Final Order expressly provides a bar

date with respect to such claim, in which event no Proof of Claim with respect to such claim shall be deemed timely unless it is filed with the Bankruptcy Court and served in the manner provided in such Final Order), or (ii) notice of the Confirmation Date. Any such claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtor or the Property.

## ARTICLE VI
## IMPLEMENTATION OF THE PLAN

a.    **Implementation.** The Debtor shall take all necessary steps and perform all necessary acts to consummate the terms and conditions of the Plan; and shall comply with all orders of the Court, including paying the Plan Fund as provided in the Plan. The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, directing the Debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect the Plan.

b.    **Funding.** Except as set forth elsewhere in the Plan, all payments required to be made under the Plan shall be made by the Disbursing Agent from the proceeds of the sale of the Apartments and cash on hand.

## ARTICLE VII
## PROVISIONS GOVERNING DISTRIBUTIONS

a.    **Disbursing Agent.**  Unless otherwise ordered by the Court, the Plan Administrator shall serve as the Disbursing Agent and shall make all distributions under the Plan, except as to those payments remitted at the closing on the sale of the Units. This shall be true even if the Plan is confirmed pursuant to section 1191(b) of the Bankruptcy Code.  (Pursuant to section 1194(b) of the Bankruptcy Code, if a Plan is

confirmed pursuant to section 1191(b), the Trustee shall make payments under the plan, "…except as otherwise provided in the Plan or in the order confirming the plan…") The size and scope of this case does not justify the continued expense of a Trustee.

b. **Timing of Distributions under the Plan.** Any payments to be made pursuant to the Plan on account of any non-disputed claim, and subject to other limitations noted, shall be made by the time stated in the Plan.

c. **Objection Deadline.** Unless otherwise ordered by the Bankruptcy Court, for cause, the Debtor may file and serve any objection to any claim at any time, but in no event after the later to occur of (i) 90 days after the Effective Date, or (ii) 90 days after the date proof of such claim or a request for payment of such claim is filed. The foregoing notwithstanding, any objection to Titan's proof of claim must be filed so as to be heard no later than the hearing on confirmation of this Plan.

d. **Prosecution of Objections.** After the Confirmation Date, only the Debtor or the Plan Administrator shall have authority to file, compromise, withdraw or litigate to judgment objections to disputed claims. The Debtor and the Disbursing Agent shall have the right to litigate to judgment, settle or withdraw any objections to any claim or Interest.

e. **No Distribution Pending Allowance.** Notwithstanding any other provision of the Plan, no payment shall be made with respect to any portion of a disputed claim unless and until all objections to such claim are resolved by Final Order. Instead, an appropriate reserve shall be established in an amount to be determined by the Bankruptcy Court but in no event less than the amount which would otherwise be due such creditor under the Plan. With respect to Titan, in the event that an objection is timely filed with respect to its claim, Titan shall be entitled to interest and attorneys' fees

accrued during the adjudication of such objection, which shall be accounted for in any reserve established with respect thereto.

      f.    **Distribution After Allowance.** Within 15 days after the entry of a Final Order resolving an objection to a disputed claim, the Disbursing Agent shall make distributions, to which a holder is then entitled with respect to any formerly disputed claim that has become an Allowed Claim.

## ARTICLE VIII
## DEFAULT

      In the event that the Debtor fails to meet its obligations hereunder, any party in interest may serve a notice of default upon the Debtor by sending notice of such default and an opportunity to cure upon (i) the Debtor by electronic mail to counsel at anne@pmlawllp.com and (ii) by first class mail to counsel for the Debtor, Anne Penachio, at her office Penachio Malara LLP, 245 Main Street, Ste 450, White Plains, NY 10601 and the Debtor c/o Jose Guerrero, 615 Warburton Avenue, Yonkers, New York 10701.  The Debtor shall be afforded 14 days from the date on which the notice is sent to cure any default.  Should the Debtor fail to cure a default, within such 14 days (or secure an extension from the Court for cause shown), the Debtor shall retain an auctioneer to sell the Apartments and promptly (within 20 days) move for approval of the retention of an auctioneer and bid procedures for the sale of the Apartments.

## ARTICLE IX
## INJUNCTION AND EXCULPATION AND RELEASE

      a.    **Injunction.** Except (i) as otherwise provided in the Plan or (ii) in any Final Order entered by the Bankruptcy Court, all persons who have held, hold, or may hold claims against, the Debtor that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from the commencement or

continuation of any action, the employment of process, from taking any act to collect, enforce, attach, recover or offset against such claim and taking any act to create, perfect or enforce any lien or encumbrance against property of the estate which is to be distributed to creditors under this Plan.

b. **Limitation of Liability**. Neither the Debtor, nor any of its officers, trustees, Board Members, or employees (acting in such capacity) nor any professional person employed by any of them shall have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, Confirmation or consummation of the Plan, or any contract, instrument, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the case or the Plan, except in the case of fraud, gross negligence, willful misconduct, malpractice, breach of fiduciary duty, criminal conduct, unauthorized use of confidential information that causes damages, or ultra vires acts.

Nothing in this Section 7.2 shall limit the liability of Professionals pursuant to DR 6-102 of the Code of Professional Responsibility.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

a. **Orders in Aid of Consummation.** Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code the Bankruptcy Court may enter one or more orders in aid of Confirmation directing the implementation of matters or actions required by the Plan.

b. **Due Authorization by Creditors.** Each and every creditor that accepts the Distributions provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Plan and that there

are no outstanding liens, encumbrances, commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights released, conveyed or modified by the Plan, or obligations undertaken by such creditor under the Plan.

        c.      **Amendments.** The Plan may be altered, amended or modified by the Debtor, in writing, signed by the Debtor, at any time before the substantial consummation of the Plan, as provided in Section 1193 of the Bankruptcy Code.

        d.      **Revocation.** Subject to the requirements of the Bankruptcy Code and Bankruptcy Rules, the Debtor may revoke or withdraw the Plan at any time prior to entry of the Confirmation Order. If the Plan is revoked or withdrawn or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any claims by or against the Debtor; or (ii) prejudice in any manner the rights of the Debtor or any other party in any further proceedings involving the Debtor or its Estate.

        e.      **Filing of Additional Documents.** Except as otherwise provided in the Plan, on or before the Effective Date, the Debtor may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, and Debtor shall be responsible for the preparation and filing of any reports necessary until the entry of a Final Decree.

        f.      **Successors and Assigns.** The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

        g.      **Notices.** All notices and other communications to be given or made

hereunder shall be in writing and shall be delivered by electronic mail and either (i) personally, (ii) by certified mail or national recognized overnight service to the addresses specified, or pursuant to change of address as filed on ECF, or (iii) as directed in writing by an interested party herein:

       (1)    if to the Debtor to Anne Penachio, Penachio Malara LLP, 245 Main Street, Suite 450, White Plains, NY 10601; anne@pmlawllp.com

       (2)    if to the Sub-Chapter V Trustee, Heidi J. Sorvino, White and Willaims, LLP, 7 Times Square, Suite 2900, New York, NY 10036, sorvinoh@whiteandwilliams.com

       (3)    if to any creditor at (i) the addresses set forth on the respective Proofs of Claim filed by such holders; (ii) the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; or (iii) the address reflected in the Schedules if no Proof of Claim is filed and the Disbursing Agent has not received a written notice of a change of address;

       (4)    if to any Entity that has filed a notice of appearance, at the address set forth on such notice of appearance.

     h.     **Governing Law.** Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other Federal law are applicable, the rights and obligations arising under the Plan shall be governed by and construed and enforced in accordance with the laws of the State of New York.

     i.     **Other Actions.** Nothing contained herein shall prevent the Debtor or creditors from taking such actions as may be reasonably necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan.

j.	**Severability.** In the event any provision of the Plan is determined to be unenforceable such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Plan.

k.	**Avoidance Actions.** The Debtor is not aware of any claims to avoid transfers. Any such avoidance claims are preserved solely as a defense to any Claim asserted against the Debtor's Estate.

**ARTICLE XI**
**RETENTION OF JURISDICTION**

**Retention of Jurisdiction.** Notwithstanding the entry of the Confirmation Order or the Occurrence of the Effective Date, until the Case is closed, the Bankruptcy Court shall retain and have original, but not exclusive, jurisdiction to:

(a)-	Insure that the Plan is consummated, and to enter any Order pursuant to section 1142(b) of the Bankruptcy Code, to compel the Debtor and any other necessary party, to take such action and execute such documents to effectuate the Plan;

(b)	Consider any modification of the Plan proposed pursuant to section 1193 of the Bankruptcy Code;

(c)	Allow, disallow, determine, liquidate, classify or establish the priority, secured or unsecured status of any Claim, including without limitation, the resolution of any request for payment of any Administrative Claim, the resolution of any and all objections to the allowance or priority of claims, and the resolution of any adversary proceeding;

(d)	Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy

Code or the Plan, for any period ending on or before the Effective Date;

(e)     Resolve any motions pending on the Effective Date to assume, assume and assign or reject any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and if necessary, liquidate, any and all claims arising therefrom;

(f)     Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(g)     Decide or otherwise resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters or grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(h)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan and Disclosures made herein or to enforce all orders, judgments, injunctions, and rulings entered in connection with the case, including, but not limited to any order necessary to enforce the provisions of the Plan;

(i)     Resolve any and all controversies, suits or issues that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligation incurred in connection with the Plan;

(j)     Remedy any defect or omission or reconcile any inconsistency in any order, the Plan, or any contract, instrument, release or other agreement or document created in connection with the Plan, to the extent authorized herein or in the Bankruptcy Code;

(k)     Issue any injunctions, enter and implement other orders or take

such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

(l)     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)     Determine any dispute arising under or related to the Plan, including, without limitation, any dispute concerning the scope or effect of any release or discharge provided for by the Plan or the Confirmation Order;

(n)     Determine any other matters that may arise in connection with or relate to the Plan, or the disclosures made therein, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan; and

(o)     Enter an order or Final Decree concluding this case.

**Post-Closing Jurisdiction.** Notwithstanding the entry of a final decree or an order closing this case, the Bankruptcy Court shall retain jurisdiction to reopen this case for the purpose of enforcing, by injunction or otherwise, the terms of the Plan, the Confirmation Order and any final decree, including, without limitation, the enforcement of any rights of the Debtor.

**Exemption From Certain Transfer Taxes.**   Section 1146 of the Bankruptcy Code is applicable to the Debtor's Plan.   It provides as follows:

(a)   The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax.

(b) The court may authorize the proponent of a plan to request a determination, limited to questions of law, by a State or local governmental unit charged with

responsibility for collection or determination of a tax on or measured by income, of the tax effects, under Section 346 of this rule and under the law imposing such tax, of the plan. In the event of an actual controversy, the court may declare such effects after the earlier of—

(1) The date on which such governmental unit responds to the request under this subsection; or

(2) 270 days after such request.

11 U.S.C. § 1146.

To the maximum extent provided by Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under, in connection with or in furtherance of this Plan as confirmed by the Court, including any deed conveying the Property in accordance with the Sale Transaction shall not be subject to tax under any law imposing a stamp tax, real estate transfer tax, mortgage recording tax or similar tax due on the Sale or transfer of the Property in connection with or in furtherance of the Plan as confirmed by the Court and the funding requirements contained herein and shall not be subject to any state, local or federal law imposing such tax and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## ARTICLE XII
## PLAN ADMINISTRATOR

The Plan Administrator shall be granted broad authority under the Confirmation Order to, among other things, investigate, make findings, report to the Court and make recommendations on all relevant matters including (i) the Debtor's financial situation, (ii) the use of funds, (iv) the propriety of Claims, (v) the Claims of 615 Warburton and TB Holdings; and (vi) the actions of Jose Guerrero and any persons in control of the Debtor. The Plan Administrator shall supervise consummation of the Plan and may, with Court approval, undertake any actions. The Plan Administrator shall have the power to retain counsel and other professionals to assist her. The Sub Chapter V Trustee shall serve as Plan Administrator. If the Sub Chapter V Trustee is unwilling or unable to serve as Plan Administrator, the Court shall designate an individual to serve in the Confirmation Order.

## ARTICLE XIII
## CONDITION TO THE EFFECTIVE DATE

**Condition Precedent to Effectiveness.** The Plan shall not become effective

unless and until the Confirmation Order has become a Final Order.

## ARTICLE XIV
## CLOSING THE CASE

a. **Substantial Consummation.** Until the occurrence of the Effective Date

and substantial consummation of the Plan, the Debtor, its property and its creditors shall

be subject to further orders of the Bankruptcy Court.

b. **Closing the Case.** Upon the substantial consummation of the Plan, the

Debtor shall expeditiously move for the entry of Final Decree closing the case and such

other relief as may be just and appropriate.

Dated: White Plains, NY
     May 11, 2023

               Penachio Malara LLP

               /s/ Anne Penachio
               Anne Penachio, Esq.
               Counsel for the Debtor
               245 Main Street, Suite 450
               White Plains, NY  10601
               (914) 946-2889